IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

---

### NASHVILLE, DECEMBER TERM, 1909.

---

E. R. RICHARDSON *et al. v.* S. M. YOUNG *et al.*

(*Nashville.* December Term, 1909.)

1. **CONSTITUTIONAL LAW.** Powers of government divided into legislative, executive, and judicial departments.

The State constitution divides the powers of government into three distinct, independent, and co-ordinate departments, namely, legislative, executive, and judicial; with express prohibition against any encroachment by one department upon the powers, functions, and prerogatives of either of the others, except as directed or permitted by some other provision of the constitution, and such division of powers and absolute separation of such departments is essential to the maintenance of the republican form of government guaranteed to the States by the federal constitution. (*Post, pp.* 490-493.)

Constitution cited and construed: Art. 2, secs. 1, 2, and 3; art. 3, sec. 1; art. 6, sec. 1.

Cases cited and approved: State v. Armstrong, 3 Sneed, 634; Mabry v. Baxter, 11 Heisk., 682-689.

14 Cates]                          (471)

Richardson v. Young.

2. SAME. Same. Theoretical definition of legislative, executive, and judicial powers.

The constitution does not define in express terms what are legislative, executive, or judicial powers; but, theoretically, the "legislative power" is the authority to make, order, and repeal the laws; the "executive power" is the authority to administer and enforce the laws; and the "judicial power" is the authority to interpret and apply the laws. (*Post, p, 493.*)

3. SAME. Same. Same. Theoretical division of powers is departed from in many instances in the constitution.

Our State constitution as well as the federal constitution, and those of a great majority, if not all, of the States, departed from the theoretical division of powers of government as defined in the preceding headnote, and in many important matters vested in each of the departments powers and authority that in strictness would belong exclusively to others; and in some instances all departments are vested with the same power, to be exercised concerning different matters, and this is especially noticeable in the vestiture of political powers. (*Post, pp.* 493-496.)

Cases cited and approved: Crane v. McGinnis, 1 Gill & J. (Md.), 476; Baltimore v. State, 15 Md., 457; Hovey v. State, 119 Ind., 395; Fox v. McDonald, 101 Ala., 51.

4. SAME. Governor has no prerogative powers, but only such powers as are vested in him by the constitution.

All sovereign power is vested in the people; and the chief executive has no prerogative powers, as in monarchal governments, but only such powers as are vested in him by the constitution as the fundamental law. (*Post, p.* 496.)

5. SAME. Power of election or appointment to office is a political power, not inherently belonging to any department.

The power of election or appointment to office is a political power, not inherently legislative, executive, or judicial, and one that may be vested with equal propriety in either of them. (*Post,* pp. 497-504,514, 515, 516.)

Richardson v. Young.

Numerous cases in other States cited and approved in the opinion, page 498, and some of them reviewed, pages 498-502.

Numerous cases in other States cited, and distinguished or disapproved in the opinion, pages 502-504).

6. **SAME.   Same.   Power of appointment to office, not otherwise vested, may be exercised by the legislature.**

In view of the constitutional history and legislative practice and the practical contemporaneous construction acquiesced in for more than seventy-five years concerning the vestiture and exercise of the power of appointment to office, and in view of the general provisions of the constitution (art. 2, sec. 3; art. 3, secs. 2 and 14; art. 6, secs. 3, 4, and 5; art. 7, secs. 1, 2, 3, and 4; art. 8, sec. 2) vesting power in the governor to fill certain offices and certain vacancies, and in view of other general provisions vesting certain elections in the people and certain appointments in the courts, and in view of the special provision (art. 7, sec. 4) that the election of all officers and the filling of all vacancies not otherwise directed or provided for by the constitution shall be made in such manner as the legislature shall direct, the whole appointive power is thus expressly disposed of, and there is nothing left for implication or construction, and the power of appointment to fill an office created by the legislature, and not made elective by the people, is not an executive function inherent in the executive department, when not otherwise expressly vested by the constitution or statute, but a political power, which, consistently with the distribution of powers of government, may properly be vested in either the legislative, executive, or judicial departments by the legislature; and hence the statute (Acts 1909, ch. 103, sec. 1) authorizing the election of the State board of elections by the legislature, instead of their appointment by the governor, is not for that reason unconstitutional.   (*Post, pp.* 504-522.)

Acts cited and construed:   Acts 1909, ch. 103, sec. 1.

Constitution cited and construed:   Art. 2, sec. 3; art. 3, secs. 2 and 14; art. 6, secs. 3, 4, and 5; art. 7, secs. 1, 2, 3, and 4; art. 8, sec. 2.

Richardson v. Young.

Cases cited and approved: Den v. Land Co., 18 How., 280; Balti-
more v. State, 15 Md., 457; Americus v. Perry, 114 Ga., 881.

7. **SAME.** Same. Same. Legislature may appoint to office by
act or joint session, where not otherwise provided by the con-
stitution.

The constitutional provision (art. 7, sec. 4), that the election of
all officers and the filling of all vacancies, not otherwise directed
or provided for by the constitution, shall be made in such man-
ner as the legislature may direct, authorizes the legislature to
exercise the appointing power by legislative act, or in joint
session of the members of the two houses; for where the consti-
tution authorizes the legislature to direct a thing to be done, it
may itself do that thing, upon the principle that the greater
power includes the less. There is no limitation of the agencies
it may employ. (*Post, pp.* 516-522.)

Constitution cited and construed: Art. 7, sec. 4.

Cases cited and approved: Luehrman v. Taxing District, 2 Lea,
440, 444; Redistricting Cases, 111 Tenn., 234, 291, 292; People v.
Langdon, 8 Cal., 17; People v. Freeman, 80 Cal., 233; Gerino,
Ex parte, 143 Cal., 414 (citing People v. Province, 34 Cal., 541;
Bulger, In re, 45 Cal., 559); Americus v. Perry, 114 Ga., 881;
People v. Hurlbut, 24 Mich., 64 (citing People v. Bennett, 54
Barb. [N. Y.], 480); Attorney-General v. Bolger, 128 Mich., 355;
Sturgis v. Spofford, 45 N. Y., 446; Fox v. McDonald, 101 Ala.,
51; Cunningham v. Sprinkle, 124 N. C., 642; Cherry v. Burns,
124 N. C., 761; Commissioners v. George, 104 Ky., 260; Cox v.
State, 72 Ark., 97.

8. **SAME.** Persons not affected by the invalidity of a separable
part of a statute cannot raise question as to the same, when.

The persons appointed by the governor as members of the State
board of elections under the original statute (Acts 1907, ch.
435) cannot, in proceedings to establish their right to the office
as against the persons holding said office under an amendatory
statute (Acts 1909, ch. 103), demand or call for a determina-
tion of the question as to the constitutionality of the third and

fourth sections of such amendatory statute which are assailed upon the ground that they impose a political test as a qualification for office in violation of the constitution (art. 1, sec. 4) prohibiting a political test, further than an oath to support the federal and State constitutions, as a qualification for office, where the alleged invalidity of said sections, if conceded, would not render the whole amendatory act void; for such parties are not interested in these particular amendments as taxpayers, because no burdens are imposed by them, nor as citizens, because they are not affected in any way not common to all the citizens of the State.     (*Post*, *p.* 522.)

Acts cited and construed:  Acts 1907, ch. 435; Acts 1909, ch. 103, secs. 3 and 4.

Constitution cited and construed:  Art. 1, sec. 4.

Case cited and approved:  Patton v. Chattanooga, 108 Tenn., 197.

**9. SAME. The invalidity of an independent and severable part of a statute will not vitiate the valid parts, when.**

Where an amendatory act (Acts 1909, ch. 103, amending Acts 1907, ch. 435) was passed for two distinct purposes, one of which was, as shown by the first section of the later act amending the first section of the prior act, to take from the governor the power to appoint the members of the State board of elections, and vest it in the general assembly, while the other was, as shown by the third and fourth sections of the later act amending the fourth and eight sections of the prior act, to define and fix the qualification and character of the appointees, the first amendment concerning the appointing power, and the second the appointees, the two amendments are separate and independent matters. The change as to the appointive power does not affect the qualifications and character of the appointees, and the appointive power under the amended act will be governed by the provisions of the original act, as to the qualifications and character of the appointees, in making the appointments, if the third and fourth sections of the amendatory act are unconstitutional, upon the well settled rule that the invalidity of one

Richardson v. Young.

provision of a statute will not vitiate those that are valid, where the invalid and valid provisions are severable and independent. (*Post, pp.* 522-524.)

Acts cited and construed: Acts 1907, ch. 435, secs. 1, 4, and 8; Acts 1909, ch. 103, secs. 1, 3, and 4.

Cases cited and approved: Tillman v. Cocke, 9 Bax., 429; Reelfoot Lake Levee District v. Dawson, 97 Tenn., 179; State v. Trewhitt, 113 Tenn., 561; Turnpike Co. v. Telephone Co., 118 Tenn., 88, 92, 99; State v. Washburn, 167 Mo., 680.

10. SAME. Constitutionality of a statute will not be determined when not necessary.

The courts will not pass upon the constitutionality of a statute, when not required for the decision of the case, and where the determination of the question would not affect the rights of the litigants. (*Post, p.* 524.)

Acts cited and construed: Acts 1909, ch. 103, secs. 3 and 4.

11. CONTESTED ELECTIONS. Chancery has no jurisdiction.

The chancery court has no jurisdiction of election contests. (*Post, p.* 525.)

Case cited and approved: Shields v. Davis, 103 Tenn., 539.

12. ELECTIONS. Provision requiring day of election of State board of elections to be fixed by joint resolution is not mandatory, but directory, governor's veto is ineffective.

The statute (Acts 1909, ch. 103, secs. 1 and 2, amending Acts 1907, ch. 435, sec. 1) requiring the State board of elections to be elected by the joint vote of both houses of the general assembly, upon a date to be fixed by joint resolution of the general assembly, instead of being appointed by the governor, expressly takes from the governor all control over their election, and vests it solely in the members of the general assembly, so that the governor cannot control such election by veto of the resolution; and the provision requiring the day of election to be fixed by joint resolution is not mandatory, but merely directory, and all that is necessary is that a time and place for the elec-

Richardson v. Young.

tion be definitely fixed by the two houses of the general assembly, and the failure to make the agreement in a particular form, or any irregularity in the assembling, will not defeat an election otherwise valid.    (*Post, pp.* 524-530.)

Acts cited and construed:   Acts 1907, ch. 435, sec. 1; Acts 1909, ch. 103, secs. 1 and 2.

Cases cited and approved:   Winston v. Railroad, 1 Bax., 78; Covington's Case, 29 Ohio St., 117.

**13. SAME. Same. Governor's veto of a joint resolution fixing date of election of officers by the general assembly does not affect the resolution or the election under it.**

The joint resolution fixing the day of the election of the State board of elections by the joint vote of both houses of the general assembly is not one which the constitution (art. 2, sec. 18) requires to be presented to the governor, and which cannot be effective without his approval, or adoption notwithstanding his veto, because that provision only concerns resolutions or orders which are legislative in their character, and does not relate to those in regard to mere matters of formal procedure, of which the house and senate have exclusive control; and a joint resolution fixing the date for the election of officers by the general assembly is not in any sense legislative, but concerns political functions solely within the jurisdiction and control of the legislature, or the members thereof, in regard to which the governor has no authority or duty to perform; and there can be no possible reason for giving him notice of such election or obtaining his consent or approval of an agreement fixing the date for holding it, for he has absolutely nothing to do with such election.    (*Post, pp.* 530-537.)

Acts cited and construed:   Acts 1909, ch. 103, sec. 2.

Constitution cited and construed:   Art. 2, sec. 18.

Cases cited and approved:   Hollingsworth v. Virginia, 3 Dall., 381; Commissioners v. George, 104 Ky., 260; Haight v. Love, 39 N. J. Law, 14; Erwin v. Mayor, 60 N. J. Law, 141; State v. Duluth, 53 Minn., 238; Rich v. McLaurin, 83 Miss., 95.

**14. SAME. Same. Same. Presentment of resolution fixing date of elections by general assembly to the governor, and his veto thereof, cannot affect the resolution, or the election under it.**

The fact that the resolution fixing the place and time for the election of the State board of elections by the general assembly was presented to the governor, and disapproved by him, did not destroy it; for when it was duly passed, as it was, the law (Acts 1909, ch. 103, sec. 2) was fully complied with, and what happened afterwards was immaterial, and cannot affect the validity of the resolution, or the election made under it. (*Post, p.* 537.)

**15. CONSTITUTIONAL LAW. Question whether the constitutional quorum of each house of the general assembly applies to the joint convention of both houses is reserved, and not decided, but the negative is indicated.**

The joint convention of the senate and house of representatives of the general assembly for the purpose of electing officers is not composed of the senate and house as distinct bodies, but is merely an electoral college composed of the members of the general assembly, without regard to the branch of the general assembly to which they were respectively elected, and all the members stand upon an equality as members of the convention. This convention is not a part of the legislative department, and has no legislative powers. Such convention is a deliberative body whose sole power is the political function of electing officers, and, inasmuch as its organization and proceedings are not regulated by any statute or constitutional provision, it would seem, like all other such bodies, this body would have the power to elect its own officers, and adopt its own rules and be governed by established parliamentary usages and laws, one of which is that a majority of the members constitute a quorum to do business, and a majority of that majority controls and has the power to do the work of the whole. From the foregoing principles it is argued, but, because deemed unnecessary for the reason stated in headnote 17, it is not decided that the constitutional provision (art. 3, sec. 11) that "not less than two-thirds

Richardson v. Young.

of all the members to which each house shall be entitled shall constitute a quorum to do business" applies exclusively to the two houses when acting separately for the purposes of legislation, or doing other business which each, as a separate house, has the power to do, and not when their members meet in joint convention for political purposes, such as the election of officers. (*Post, pp.* 537-550, 565.)

Code cited and construed:   Secs. 1136, 1138, 1139, 1141 (S.); secs. 1003, 1005, 1006, 1008 (M. & V.); secs. 812, 814, 815, 816a (T. & S. and 1858).

Acts cited and construed:   Acts 1909, ch. 103, sec. 1.

Constitution cited and construed:   Art. 3, sec. 11.

Cases cited and approved:   Lawrence v. Ingersoll, 88 Tenn., 62; Snow v. Hudson, 56 Kan., 386; Tillman v. Otter, 93 Ky., 600; Whiteside v. People, 26 Wend. (N. Y.), 634; Beck v. Hanscom, 29 N. H., 213; Kimball v. Marshall, 44 N. H., 465; Davidson v. Call, 2 Hinds' Prec. of the House of Rep., sec. 1060.

16. ELECTIONS.  By joint convention of the general assembly is authorized by requirement of election by joint vote of both houses.

A statute or constitutional provision requiring officers to be elected by the joint vote or ballot of both houses of the legislature, by implication, clearly authorizes a joint convention of the members of the general assembly for such election purposes, and this has been the uniform custom.   (*Post, pp.* 537, 538.)

Acts cited and construed:   Acts 1909, ch. 103, sec. 1.

Constitution referred to and construed:   Art. 7, sec. 3.

17. CONSTITUTIONAL LAW.  Question whether election by joint vote of the general assembly was invalid for want of constitutional quorum of senate was reserved, because cured by appointment.

In a suit to establish the right of complainants as members of the State board of elections under an appointment by the governor, as against the defendants appointed as such members by the

Richardson v. Young.

comptroller, treasurer, and secretary of State, pursuant to Acts 1909, ch. 103, sec. 3, after the adjournment of the legislature, it is not necessary or determinative of the case to decide whether the attempted election of the defendants as such members by the joint vote of the general assembly pursuant to the first section of said act was invalid for want of a constitutional quorum of the senate in the convention, as shown in headnote 15; for, if the successors of complainants have been either lawfully elected or appointed, the terms of complainants have expired and they have no standing in court; and it being determined that such appointment was valid, as shown in headnote 18, it was unnecessary to determine whether such election was valid. (*Post, pp.* 537, 550, 565.)

Acts cited and construed: Acts 1909, ch. 103, secs. 1 and 3.

18. **ELECTIONS.** Vacancies in State board of elections may be filled by secretary of State, comptroller, and treasurer, when.

Under a statute (Acts 1909,. ch. 103, sec. 3) providing that all vacancies in the State board of elections shall be filled by the joint vote of the general assembly, except vacancies occurring while it is not in session, when, if the office of only one member is vacant, the remaining members of the board shall fill the vacancy, and if they fail to do so within thirty days, it shall be filled by the secretary of State, comptroller, and treasurer, and that if there be more than one vacancy, it shall be filled by appointment by such officers, it is decided, in view of the fact that a newly created office is vacant until it is filled, and that the word "vacant" when applied to office, means "without an incumbent," regardless of when or how it became vacant, and that the words "occur" and "happen," when referring to vacancies in office, are synonymous, and mean "existing" or "to be found," that the comptroller, secretary of State, and treasurer are authorized to fill two or more vacancies in the State board of elections during the recess of the legislature, without regard to the time when the vacancies occurred, whether during the recess or while the legislature was in session. (*Post, pp.* 550-565.)

Acts cited and construed: Acts 1909, ch. 103, sec. 3.

Richardson v. Young.

Constitution of the United States cited and construed:     Art. 1, sec. 3; art. 2, sec. 2.

Cases cited and approved:     State v. Glenn, 7 Heisk., 472; Condon v. Maloney, 108 Tenn., 82; State v. Akin, 112 Tenn., 603; Farrow, In re, 3 Fed. (C. C.), 112; Clarke v. Irwin, 5 Nev., 129; Fritts v. Kuhl, 51 N. J. Law, 192, 194, 195, 196; Fairbank v. Antrim, 2 N. H., 105; Pike v. Jenkins, 12 N. H., 255; Miller v. Washington, 2 Hayw. & H., 244; Walsh v. Com., 89 Pa., 419; State v. Ware, 13 Or., 380; In re Representation Vacancy, 15 R. I., 621; Elliott v. Burke, 113 Ky., 479; Senate Election Cases, sec. 2, subsecs. 107, 110; Opinions of Attorneys-General, vol. 3, p. 673; vol. 4, p. 523; vol. 7, p. 187; vol. 12, pp. 32, 499; vol. 16, p. 522.

19. SAME. Same. Question of doubt as to power to fill vacancies would be resolved in favor of the power.

If the question was one of doubt about the power of the comptroller, secretary of State, and treasurer to fill vacancies in the offices of the members of the State board of elections occurring during a session of the legislature and left unfilled by that body, public policy and the effective administration of the law would require the doubt to be resolved in favor of the power to appoint. (*Post, p.* 564.)

Acts cited and construed:     Acts 1909, ch. 103, sec. 3.

20. CONSTITUTIONAL LAW. Concurrent passage of two distinct legislative bills upon their second reading does not invalidate them.

While the passage of a bill in the house of representatives upon a second reading, concurrently with another bill relating to a different subject, would be contrary to good parliamentary procedure and should not be done upon objection made, yet this alone will not authorize the courts to hold such reading and passage to be nugatory, so as to invalidate the act. (*Post, p.* 566.)

122 Tenn—31

Richardson v. Young.

Acts cited and construed:   Acts 1909, ch. 103.

Constitution cited and construed:   Art. 2, sec. 18.

21. **SAME.** Same. Journal entry that is not conclusive that two bills were voted upon at the same time.

A journal entry reciting that it was "moved that house bills 340 and 341 be passed upon second reading and referred to committee on elections," where another entry shows that this motion prevailed by a constitutional majority, is not conclusive evidence that the two bills were voted upon at the same time. (*Post, pp.* 565, 566, 567.)

Acts cited and construed:   Acts 1909, ch. 103.

Constitution cited and construed:   Art. 2, sec. 18.

Case cited and approved:   Nelson v. Haywood Co., 91 Tenn., 605.

22. **SAME.** Same. Same. Presumption in favor of regularity of passage of acts, where journal entries do not affirmatively show noncompliance with constitution.

Every reasonable inference and presumption will be drawn and indulged in favor of the regularity of the enactment of a statute, signed by the speakers of both houses and approved by the governor, or otherwise passed, that is, afterwards passed over the veto of the governor, if the bill was disapproved by him; and where the journal of the house of representatives recited that two bills, which related to different subjects, were passed upon their second reading at the same time, it will be presumed that the recital was an inaccurate statement of the clerk, or a clerical error, or that the bill in question, which was signed by the speakers of both houses and finally enacted as a law, was subsequently lawfully passed upon its second reading; for it does not affirmatively appear from said recital in the journal that the constitutional requirement was not complied with, as such recital was not conclusive that the two bills were voted upon at the same time.   (*Post, pp.* 567-569.)

Acts cited and construed:   Acts 1909, ch. 103.

Constitution cited and construed:   Art. 2, sec. 18.

Richardson v. Young.

Cases cited and approved: State v. McConnell, 3 Lea, 341; Williams v. State, 6 Lea, 553; State v. Algood, 87 Tenn., 167; Nelson v. Haywood Co., 91 Tenn., 605; State v. Swiggert, 118 Tenn., 562.

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. —John Allison, Chancellor.

J. C. Bradford, J. J. Vertrees, W. O. Vertrees, and D. B. Puryear, for complainants.

Attorney-General Cates, Pitts & M'Connico, Luke Lea, J. N. Fisher, and O. K. Holladay, for defendants.

Mr. Justice Shields delivered the opinion of the Court.

E. R. Richardson, N. G. Robertson, and F. A. Raht, claiming to be the members of the state board of elections created by the general assembly by chapter 435, Acts 1907, and as citizens and taxpayers, bring this bill against S. M. Young, I. B. Tigrett, and James Maynard, who also claim to be members of the state board of elections by election and appointment under the provisions of chapter 103, Acts 1909, an act amending chapter 435,

Acts 1907, for the purpose of asserting their title to the offices of members of the state board of elections, and their right to exercise the powers and duties, and receive and enjoy the emoluments, of the offices, and to enjoin the defendants from interfering with and obstructing them therein, and drawing from the treasurer of the State the salaries and expenses allowed the board, upon the ground that the latter act (chapter 103, Acts of 1909) is unconstitutional and void, or, if mistaken in this, that the defendants were never lawfully elected or appointed, and therefore complainants are entitled to hold the offices until their successors are elected or appointed.

The act of the general assembly creating the first state board of elections was passed April 9, 1907.

Section 1 of this act provides that there shall be appointed by the governor, and confirmed by the senate, a board of three persons, to be known as the "State Board of Elections," which shall have and exercise all powers now conferred upon the governor to appoint commissioners of elections and registration.

Section 2 provides that not more than two of the three members of the board "shall be of the same political party, and that both the representatives of the majority and minority parties shall be *bona fide* members of the party they are appointed to represent," and that two members shall constitute a quorum for the transaction of business.

Section 3 prescribes the time of the appointments of the members of the board.

Richardson v. Young.

Section 4 provides that the members of the board first appointed shall hold office until the first Monday in March, 1909, and thereafter their successors for two years, and until their successors are appointed; all vacancies to be filled as in the first instance, except when occurring while the legislature is not in session, and then by the governor, to hold until the convening of the legislature.

Section 5 fixes the compensation of the members of the board, prescribes the oath they shall take, and requires them to qualify within 10 days after appointment.

Sections 6 and 7 provide for the expenses of the board, and meetings to be held by them for the transaction of business.

Section 8 is in these words: "Be it further enacted, that said state board of elections shall select and appoint on the second Monday in May, 1907, or as soon thereafter as practicable, and on the second Monday in May every two years thereafter, three commissioners of election for each county in the State: provided, that no more than two of said commissioners shall be of the same political party; and, provided further, that the state board of elections shall have the power to remove any commissioners of elections for cause or failure to perform their duties; and said state board of elections shall likewise fill by appointment all vacancies occurring in the county board of commissioners of election."

Sections 9 and 10 require the board of elections to

issue commissions to the county commissioners of elec-
tion and to keep certain records of their proceedings.

Section 11 repeals all laws in conflict with the act.

Complainants were duly appointed by the governor
and confirmed by the senate, and were exercising the
powers and discharging the duties of the state board of
elections, when an amendatory act was enacted, and
the defendants appointed thereunder.

The amendatory act (chapter 103, Acts 1909) was
passed February 12, 1909, and is entitled:

"An act to amend an act entitled, 'An act to create
a state board of elections, to provide for the manner
of their appointment, their terms of office, their com-
pensation, and to define their duties and powers,' passed
April 9, 1907, and being chapter 435 of the printed Acts
of 1907."

Section 1 of this act amends section 1 of the original
act, so that it shall read: "That there shall be elected
by the joint vote of both houses of the general assem-
bly a board of three persons to be known as 'the State
Board of Elections,' which shall have and exercise all
the powers conferred upon said board by the Acts of
1907, chap. 435, entitled as set out in the caption
hereof."

Section 2 amends section 3 of the original act, so as
to provide:

"That the members of the first state board of elec-
tions shall be elected prior to the first Monday of April,
1909, upon a day to be fixed by joint resolution of the

general assembly, and thereafter during each biennial session of the general assembly one member of such board shall be elected on such date prior to the first Monday of April as may be fixed by joint resolution of both houses of the general assembly."

Section 3 amends section 4 of the original act, so as to provide:

"That the term of the office of the members of the state board of elections first elected as hereinbefore provided shall be for two (2), four (4) and six (6) years, respectively, from the first day of April, 1909. The terms of each member of the first board shall be fixed when he is elected by the joint vote of the general assembly, as hereinbefore provided, and thereafter the term of the member elected at each recurring biennial session of the general assembly shall be for six (6) years from the first Monday of April succeeding his election. All members of said state board of elections shall continue in office until their successors are elected and qualified, and all elections of successors to the first board, or to fill vacancies in that or any subsequent board, shall be *bona fide* members of the same party to which the member whose successor is to be elected or the member causing the vacancy belonged. All vacancies shall be filled as in the first instance by joint vote of the general assembly, except vacancies occurring when the general assembly is not in session, when, if the office of only one member is vacant, an appointment to fill such vacancy shall be made by the remaining

members of the board within thirty (30) days after the vancancy occurs; and, provided, further, that in the event the remaining commissioners fail to fill the appointment within the time mentioned, the same shall be filled by the secretary of State, comptroller, and treasurer, or a majority from the same party in which the vacancy occurred, to hold until the convening of the general assembly; but if there be more than one vacancy on said board, the same shall be filled by appointment of the secretary of State, comptroller, and treasurer, or a majority of those officers."

Section 4 amends section 8 of the original act, so as to provide:

"That said State board of elections shall elect and appoint on the second Monday in May, 1909, or as soon thereafter as practicable, and on the second Monday in May every two years thereafter, three (3) commissioners of elections from each county of the State; provided, that not more than two of said commissioners shall be of the same political party, and that the representatives of the majority and minority parties shall be *bona fide* members of the party they are appointed to represent, and any two members of said board shall constitute a quorum for the transaction of business; that each member of the state board of elections herein provided for shall have the right and power to designate and appoint without the consent of his associates, one of said commissioners of elections in said county; and, provided, further, that said state board of elections

shall have full power to remove any commissioner of elections for cause or failure to perform his duties, and the vacancy thereby caused shall be filled by that member of the State board of elections who in the first instance appointed the commissioner so removed.

"By minority party is meant the party polling in the State of Tennessee the second highest number of votes for presidential electors at any presidential election immediately preceding the appointment of officers under the act."

. Section 5 provides that the act shall take effect from and after its passage, the public welfare requiring it.

The defendants, Young, Tigrett, and Maynard, were elected members of the State board of elections by the members of the general assembly in joint convention, and, after this suit was brought, were appointed by the secretary of State, comptroller, and treasurer, that all questions arising under this act might be settled herein, but the legality of their election and appointment is challenged for causes which will be hereafter stated, and were, when this bill was filed, exercising the powers and duties of the State board of elections, as defined in the original and amendatory acts.

The general assembly had two separate and distinct purposes in view in enacting the amendatory act.

The first of these was to change the manner of choosing the members of the State board of elections, and the second, to more effectually secure to the minority party *bona fide* representation in the appointment of election officers in this State.

These purposes were sought to be effected by amending different sections of the original act, and the several amendments are assailed as contravening different provisions of the constitution, and must necessarily be treated separately.

We will first consider and dispose of the objections made to the amendment of the first section of the original act, taking from the governor the power of appointing the State board of elections, and providing that the members of it shall be elected by a joint vote of both houses of the general assembly, and for the filling of vacancies that may happen when that body is not in session.

Complainants' contention, tersely stated, is that the power of appointment to office is an executive function, and falls within the powers committed by the constitution to the executive department, and therefore the amendment vesting the authority to elect the State board of elections in the members of the general assembly violates the provisions of the constitution distributing the powers of government.

The constitutional provisions referred to, are as follows:

"The powers of government shall be divided into three distinct departments: The legislative, executive, and judicial.

"No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in cases herein directed or permitted." Article 2, secs. 1, 2.

"The legislative authority of this State shall be vested in a general assembly, which shall consist of a senate and a house of representatives, both dependent upon the people." Article 2, sec. 3.

"The supreme executive power of this State shall be vested in the governor." Article 3, sec. 1.

"The judicial power of this State shall be vested in one supreme court, and any such circuit, chancery, and other inferior courts as the legislature shall, from time to time, ordain and establish; in the judges thereof and in the justices of the peace." Article 6, sec. 1.

The constitution of this State adopted in 1834, contained these same provisions. That adopted in 1796 provided for the same separation of the powers of government, but did not contain the express prohibition against one department exercising the powers or functions of the others.

Similar provisions are found in the constitution of the United States, and the constitutions of all the States, and they have been held essential to the republican form of government guaranteed to the States by the constitution of the United States. They vest the powers of government in three distinct, independent, and co-ordinate departments, legislative, executive, and judicial, with express prohibition against any encroachment by one upon the powers and prerogatives of the other, except as directed or permitted by some other provision of the constitution.

Concerning their meaning, in a broad sense, and their importance, this court has said:

Richardson v. Young.

"In the theory of our government, all sovereignty is inherent in the people. The constitution of this State so expressly declares. It further declares (article 2, sec. 1) that 'the powers of government shall be divided in the three distinct departments, the legislative, executive, and judicial,' and (section 2) that no one of these departments 'shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted.' Thus each department is limited within its own appropriate sphere. To each has been delegated by the people—whose agents they are—such portion of sovereignty as was deemed expedient. On the one hand, neither can assume the exercise of any of the powers conferred upon either of the others; nor, on the other, can either divest itself—by transfer to another department, or other subagent—of any portion of the power expressly confided to its own exercise, except in virtue of its explicit authority to that effect given by the constitution itself." *State* v. *Armstrong,* 3 Sneed, 634.

And again:

"It is essential to the maintenance of republican government that the action of the legislative, judicial, and executive departments should be kept separate and distinct, as it is expressly declared it shall be by the constitution (article 2, secs. 1 and 2). The most responsible duty devolving upon this court is to see that this injunction of the constitution shall be faithfully observed. We have no right to go outside of the

statutes presented for our examination and adjudication, to look into the motives for their enactment. We are to confine ourselves to the provisions of the statute itself, and in our decisions we are to presume that the legislature not only acted upon considerations of public good, but that they acted within the sphere of their legitimate powers. Conceding all this, we are bound, on the other hand, whenever in our deliberate judgment these legitimate powers have been transcended, to interpose for the protection and preservation of the constitution." *Mabry* v. *Baxter*, 11 Heisk., 682-689.

The constitution does not define in express terms what are legislative, executive, or judicial powers.

Theoretically, the legislative power is the authority to make, order, and repeal; the executive, that to administer and enforce; and the judicial, that to interpret and apply, laws.

In the writings of Montesquieu, and other political scientists, much consulted when the first American constitutions were framed and adopted, it is said, in substance, that the absolute separation of the legislative, executive, and judicial departments was essential to a republican form of government, and necessary for the perpetuation and maintenance of the political liberties of the people. But the framers of the federal constitution, and those of a great majority, if not all, of the States, including Tennessee, notwithstanding the objections of some of the ablest statesmen of that day,

departed from this theoretical division of the powers of government, and in many important matters vested in each of them powers and authority that in strictness would belong exclusively to the others; and in some instances all departments are vested with the same power, to be exercised concerning different matters, and this is especially noticeable in the vestiture of political powers.   This is obvious from an examination of those several instruments, and has been frequently referred to in judicial decisions.

In *Crane* v. *Meginnis,* 1 Gill & J. (Md.), 476, 19 Am. Dec., 241, it is said:

"In whatever terms they have adopted it, in none of these constitutions are the several departments kept wholly separate and unmixed.   In some of them, as in the constitution of this State, the executive is appointed by the legislature, and the judiciary by the executive; and in others blended and mingled together."

In *Baltimore* v. *State,* 15 Md., 457, 74 Am. Dec., 579, it is said:

"This article is not to be interpreted as enjoining a complete separation between these several departments.   Practically it has never been so in any of the states in whose fundamental law the principle has been asserted.   There are numerous instances to show that it has not been so regarded in this State, for our statute books contain, time and again, laws affording relief where the judiciary possessed ample jurisdiction over the subject-matter.   How this kind of legislation

came to be introduced, it is useless now to inquire. It commenced soon after the adoption of the constitution, probably participated in by some of the framers of that instrument, and has been continued ever since."

There are also some powers which, on account of the complexity of governmental functions, are difficult to classify, and may be, with equal propriety and correctness, committed to more than one department.

Judge Cooley, in his Constitutional Limitations, p. 157, says:

"It is difficult to point out the precise boundary which separates legislative from judicial. It is still more difficult to discriminate, in particular cases, between what is properly legislative and what is properly executive duty."

In *Hovey* v. *State,* 119 Ind., 395, 21 N. E., 21, it is said:

"The boundaries which separate the functions of the different departments are broad, clear, and distinct, as applied to matters affecting property rights or private concern, or the execution or enforcement of existing law; but it is not easy, where the constitution is silent, to discriminate or formulate definitions as to what constitutes legislative, executive, and judicial authority, when questions of public policy, or which relate to the best means and agencies for accomplishing a governmental end, or of executing the law, are involved."

In *Fox* v. *McDonald,* 101 Ala., 51, 13 South., 416, 21 L. R. A., 529, 46 Am. St. Rep., 98, Head, J., speaking for the court, says:

"There are many acts possessing a legislative, executive, or judicial character, especially peculiar to the very nature of our system, and necessarily inherent in it, which time out of mind have not been exclusively exercised by these departments, and which, for the ease and efficiency of our system, could not be so exercised."

And again he says:

"There are functions which are often performed by one of these departments of such a character that their performance does not necessarily belong to it, and where such is the case the authority of the department is not necessarily exclusive, and other departments may be required to perform the same or a similar function."

All sovereign power, under our form of government, is vested in the people. The chief executive has no prerogative powers, as in monarchal governments, but only such as are vested in him by the fundamental law. The constitutions of the original States, first adopted, vested most of the appointing power in the legislative department, and very little of importance in the chief executive, doubtless guarding against its abuse, from which they had recently suffered under the government of England. In the constitutions of all the States, the most important part of it has been generally vested in the people, to be exercised in popular elections, and the

remainder in unequal proportions in all three of the departments, much more, as a rule, in the legislative than the others, and often less in the executive than the judicial.

Whatever may have been its nature theoretically, in practical application in this country, this power has not been considered as belonging to either of the departments, or any general rule observed in vesting it. It will hardly be found vested in the same way in the fundamental law of any two of the States. In every case involving the right of its exercise by a particular department, courts are necessarily to be governed by the special provisions of the constitution of the State where the question arises. We think, from a general review of the authorities, that it is now established that under the American form of government the power of election or appointment to office is a political power, not inherently legislative, executive, or judicial, but which may be vested with equal propriety in either of them, and that it is so treated and applied in a majority of the States.

There is some conflict in judicial opinion upon this question, resulting generally from the differences in the fundamental law of the several States; but we think our conclusions are supported by the weight of authority, especially by the decisions of the courts of the States which have constitutional provisions concerning the appointing power identical or similar to those of this State.

122 Tenn—32

Among other cases are those of *People* v. *Langdon*, 8 Cal., 16; *People* v. *Morgan*, 90 Ill., 558; *Baltimore* v. *State*, 15 Md., 376, 74 Am. Dec., 572; *Overshiner* v. *State*, 156 Ind., 187, 59 N. E., 468, 51 L. R. A., 748, 83 Am. St. Rep., 187; *People* v. *Freeman*, 80 Cal., 233, 22 Pac., 173, 13 Am. St. Rep., 122; *Cox* v. *State*, 72 Ark., 97, 78 S. W., 756, 105 Am. St. Rep., 17; *Americus* v. *Perry*, 114 Ga., 881, 40 S. E., 1004, 57 L. R. A., 230; *People* v. *Hurlbut*, 24 Mich., 63, 9 Am. Rep., 103; *Atty. Gen.* v. *Bolger*, 128 Mich., 355, 87 N. W., 366; *State* v. *Irwin*, 5 Nev., 111; *Sturgis* v. *Spofford*, 45 N. Y., 446; *Rogers* v. *Buffalo*, 123 N. Y., 173, 25 N. E., 274, 9 L. R. A., 579; *People* v. *Bennett*, 54 Barb. (N. Y.), 481; *State* v. *George*, 22 Or., 142, 29 Pac., 356, 16 L. R. A., 737, 29 Am. St. Rep., 586; *Biggs* v. *McBride*, 17 Or., 648, 21 Pac., 878, 5 L. R. A., 115; *Fox* v. *McDonald*, 101 Ala., 51, 13 South., 416, 21 L. R. A., 529, 46 Am. St. Rep., 98; *Ex parte Siebold*, 100 U. S., 371, 25 L. Ed., 717; *Cherry* v. *Burns*, 124 N. C., 761, 33 S. E., 136; *Cunningham* v. *Sprinkle*, 124 N. C., 642, 33 S. E., 138; *State* v. *Seymour*, 35 N. J. Law, 54; *Hovey* v. *State*, 119 Ind., 401, 21 N. E., 21; *Ex parte Gerino*, 143 Cal., 414, 77 Pac., 166, 66 L. R. A., 249; *State* v. *Rosenstock*, 11 Nev., 128; *Sinking Fund Com'rs* v. *George*, 104 Ky., 260, 47 S. W., 779, 84 Am. St. Rep., 454.

We will quote from only a few of these cases. In *People* v. *Langdon*, supra, it is said:

"The power to fill any office is political, and the power is exercised in common by the legislatures, the

governors, and other executive officers of every State in the Union, unless it has been expressly withdrawn by the organic law of the State. That it has not been by our constitution there can be no doubt: First, because there is no clause that would warrant such a construction; and, second, because there are several that would forbid it.

"It would be useless to pursue this argument further. This power has always been exercised by the legislature, and never before denied. It is not prohibited by the constitution, and according to the theory and spirit of our institutions, is safer when exercised by the immediate representatives of the people than when lodged in the hands of the executive."

In *People* v. *Morgan,* supra, the court said:

"The executive power in the State is understood to be that power, wherever lodged, which compels the laws to be enforced and obeyed. The instrumentalities employed for that purpose are officers, elected or appointed, who are charged with the enforcement of the law. But the power to appoint is by no means an executive function, unless made so by the organic law or legislative enactment; and in this case it is not so unless the power is thus conferred. If it were conceded that these appointments were the exercise of political power, would it necessarily be violative of any provision of the constitution? The division and allotment of powers are not into political, executive, and judicial, but into legislative, executive, and judicial.

It was no doubt the exercise of political power, as that embraces all governmental powers and functions, whether exercised by one department or another, or the officers of one or the other. Political power is the policy of government or its administration, and may be exercised either in the formation or administration of government, or both. Hence it follows that, if it be a political power, that of itself in no wise militates against its exercise by a person belonging to the judicial department of the government."

In the case of *Baltimore* v. *State,* supra, it is said:

"It is contended that, the power of appointment being an intrinsic executive function, the naming of the commissioners in the law was in violation of the sixth article of the declaration of rights: 'That the legislative, executive, and judicial powers of government ought to be forever separate and distinct from each other, and no person exercising the functions of one of the said departments shall assume or discharge the duties of the other.'

"We are not prepared to admit that the power of appointment to office is a function intrinsically executive, in the sense of which we understand the position to have been taken, *viz.,* that it is inherent in, and necessarily belongs to, the executive department. Under some forms of government, it may be so regarded; but the reason does not apply to our system of checks and balances in the distribution of powers, where the people are the source and foundation of government, ex-

erting their will after the manner and by instrumental-
ities specially provided in the constitution."

In the case of *Overshiner* v. *State,* supra, the court
said:

"We concede in fullest terms appellant's contention
that our state government is composed of three distinct
and co-ordinate branches, *viz.,* the legislative, executive
(including the administrative), and judicial, and that
the powers that are committed by the people to one
branch cannot be exercised by those performing duties
in another without express authority to do so, or the
exercise of such powers becomes essential or appropri-
ate to the effective discharge of the duties imposed upon
such branch.   And while it has been many times de-
cided by this and other courts that, as a general rule,
the power of appointment to office is an appropriate
executive prerogative, yet, as said by Mitchell, J., in
*Hovey* v. *State,* 119 Ind., 401, 21 N. E., 21: 'It is a
fundamental error, however, to assume that the exclu-
sive right to exercise the power of appointment is in-
cluded in the general grant of power to the executive.'
In the distribution of governmental power the people
had the undoubted right to lodge any part of it where
it pleased them, and, when expressly placed, the court
will suffer no encroachment upon it by those acting in
another department; but where the constitution is si-
lent, and the question is one of public policy, or re-
lates to the best means or agency for the attainment
of some governmental end, it must be presumed that

the framers of the constitution intended to invest the legislative body with a large discretion in the selection of the agencies most suitable and beneficial to the public."

In *Cox* v. *State,* supra, this is said:

"First, as to the power of the legislature to make appointments to office: In the United States the general power to appoint officers is not inherent in the executive or in any other branch of the government. It is a prerogative of the people, to be exercised by them or that department of the State to which it has been confided by the constitution. The legislature has, we think, power to make appointments to office, unless its powers in that respect are restricted by the constitution, either expressly or by implication."

Cases cited by complainants as sustaining their position that the appointing power is inherently an executive function, belonging to the executive, are *State* v. *Kennon,* 7 Ohio St., 546; *State* v. *Stanley,* 66 N. C., 59, 8 Am. Rep., 488; *People* v. *Bledsoe,* 68 N. C., 457; *State* v. *Offill,* 74 Neb., 669, 105 N. W., 1099; *State* v. *Hocker,* 39 Fla., 477, 22 South., 721, 63 Am. St. Rep., 174; *State* v. *Barbour,* 53 Conn., 76, 22 Atl., 686, 55 Am. Rep., 65; *State* v. *Denny,* 118 Ind., 449, 21 N. E., 274, 4 L. R. A., 65; *Evansville* v. *Indiana,* 118 Ind., 426, 21 N. E., 267, 4 L. R. A., 93; *Jameson* v. *Denny,* 118 Ind., 382, 21 N. E., 252, 4 L. R. A., 79; *Pratt* v. *Breckinridge,* 112 Ky., 12, 65 S. W., 136, 66 S. W., 405; *Taylor* v. *Com.,* 3 J. J. Marsh. (Ky.), 401; *State* v.

*Washburn,* 167 Mo., 680, 67 S. W., 592, 90 Am. St. Rep., 430.

The Ohio and North Carolina cases are not authority here, because the constitutions of those States, when these decisions were made, absolutely prohibited the legislature from exercising any appointing power.

After the North Carolina cases were decided, the constitution of that State was amended so as to eliminate the prohibitory clause, and under a provision similar to article 7, section 4, of the constitution of Tennessee, it was held that the general assembly could exercise the power directed. *Cherry* v. *Burns,* 124 N. C., 761, 33 S. E., 136; *Cunningham* v. *Sprinkle,* 124 N. C., 642, 33 S. E., 138.

The Florida case is not in point, as the constitution of that State committed the appointing power to the people and the governor, when not otherwise expressly vested in that instrument.

The cases of *Taylor* v. *Commonwealth* and *State* v. *Barbour,* supra, while stating abstractly that the power is an executive function, do not really involve the question here presented.

The Indiana cases cited do support complainants' position; but the contrary seems to have been held in *Hovey* v. *State,* 119 Ind., 395, 21 N. E., 21, and *Overshiner* v. *State,* 156 Ind., 187, 59 N. E., 468, 51 L. R. A., 748, 83 Am. St. Rep., 187, from which we have quoted.

The cases of *State* v. *Washburn* and *Pratt* v. *Breckinridge,* supra, fully sustain complainants; but, so far

as our investigations have extended, the courts of Missouri and Kentucky stand alone in adhering strictly to the doctrine of the exclusive right of the executive to exercise the appointing power, in the absence of constitutional provisions vesting it otherwise. We do not think it is necessary, in the view we have taken of the question, to review these cases.

The constitution provides for the filling of offices created by it by election by the people, or appointment by some authority therein named, and as to these there can be no controversy. The contention here concerns offices which are created by the general assembly in the exercise of its inherent power to do so, as the welfare of the State may from time to time require.

Complainants do not claim there is any provision of the constitution which expressly vests the power of appointment to these offices in the governor, and there is none. The only provision contained in the constitution upon this subject is article 7, section 4, which ordains:

"The election of all officers and the filling of all vacancies not otherwise directed or provided by this constitution shall be made in such manner as the legislature shall direct."

The question then presented is whether, under the constitution of Tennessee, the filling of an office created by the general assembly, and not made elective by the people, is an executive function, which the governor has the exclusive power to exercise under article

3, section 1, of the constitution, vesting the supreme executive power of this State in the governor; or may the general assembly exercise it, directly or indirectly, or confer it upon some other authority, under article 7, section 4, of that instrument?

These questions must be determined upon the provisions of the constitution of this State, and the construction they have received by those whose duty it has been to execute them. The decisions of the courts of other States, having similar constitutional provisions, will also, when the question is not clear, be of assistance. Abstract propositions of the theoretical division and nature of the powers of government can only be resorted to when the constitution is silent.

We will briefly review the constitutional history of this State concerning the vestiture and exercise of the appointing power, before examining the provisions of our present constitution upon this subject.

Tennessee was largely settled by immigrants from Virginia and North Carolina, and they doubtless came with favorable impressions of the constitutions which had been recently adopted in those States, and were controlled more or less by them in framing the organic law of this State.

The constitutions of those States, adopted in 1776, although the powers of government were separated into three distinct departments, legislative, executive, and judicial, and each prohibited from exercising the powers properly belonging to the others, vested in the

general assembly the power to elect all their important officers, including the governor, judges of all the courts, attorneys-general, secretary of State, treasurer, and gave the governor very little appointing power. These constitutions remained in force well up into the next century.

The constitution of Tennessee, adopted in 1796, in many of its provisions, especially those in regard to filling public offices, closely followed those of Virginia and North Carolina. The governor, members of the general assembly, and most of the militia officers were required to be elected by the people. The general assembly was empowered to appoint judges of the civil courts of law and equity, attorneys for the State, and "all officers not otherwise directed by this constitution;" courts to appoint their clerks; and county courts to appoint sheriffs, coroners, trustees, registers, rangers, and constables.

The appointing power of the governor was confined to the appointment of an adjutant general, and filling vacancies occurring during recess in constitutional offices appointed by the general assembly, by granting temporary commissions, to expire at the end of the next session of the legislature. Const. 1796, art. 1, sec. 1; article 2, sec. 1; article 5, sec. 2; article 6, sec. 3.

The governor, under this constitution, could not be authorized by statute to make a temporary appointment to an office filled by the legislature. *Smith* v. *Normant*, 5 Yerg., 271.

The constitution of 1834 provided that the governor, members of the general assembly, clerks of the courts other than those of the supreme court and chancery court, sheriffs, trustees, and registers should be elected by the people; that the judges of the supreme court and all inferior courts, the secretary of state, and the treasurer should be appointed, and that the attorneys of the State be elected by the joint vote of both houses of the general assembly; that the judges of the supreme court and chancellors should appoint their clerks; that the justices of the peace should elect coroners and rangers; and "that the election of all officers and the filling of all vacancies that might happen by death, resignation, or removal, and not otherwise directed or provided for by this constitution, shall be made in such manner as the legislature shall direct."

The general assembly was also authorized to make provision by general laws for the appointment of special judges, where the regular judges of the courts were unable to attend on account of sickness. Vacancies in the offices of clerks elected by the people were to be filled by the courts, and those of sheriff, trustee, and register by the justices of the county.

The only appointing power vested in the governor was that to appoint an adjutant general and his other staff officers, and to temporarily fill vacancies in constitutional offices, as in the constitution of 1796. Const. 1834, art. 2, sec. 3; article 3, secs. 2, 13, 17; article 6, secs. 3, 4, 5, 11, 13; article 7, secs. 1, 2, 3, 4; article 8, sec. 2.

The chief differences in the constitution of 1796 and this, in relation to the appointing power, are the provisions for the election of some of the county officers and the change of the clause authorizing the "legislature to appoint all officers not otherwise directed by the constitution," so as to read as above stated, and conferring upon the legislature the authority to provide by general laws for the appointment of special judges. The only increase in the power of the governor was that to appoint his staff officers.

This constitution was amended in 1853, so as to provide that judges, the attorney-general, and district attorneys should be elected by the people, which was a further assumption of sovereignty by the people, but no increase of the power of the executive.

In the interval between the adoption of the constitution of 1834 and that of 1870, the successive general assemblies, construing article 7, section 4, providing that the election of all officers and the filling of all vacancies not otherwise directed or provided for by the constitution should be made in such manner as the legislature should direct, as an extension, not as a limitation, of the power of appointment to new offices created by statute, continued to elect statutory officers, and to create others, either filling them in the act, or conferring the power to do so upon their members in joint session, the governor, and other officers of the State, counties, and municipalities, in their discretion.

Among other offices created by statute and filled by

the general assembly in the act creating them, or by the members in joint session, we call attention to the following:

Comptroller of the treasury, to be elected by the general assembly, which was done at every session until 1870, under act creating the office. Acts 1835-36, c. 12.

State superintendent of public instruction, appointed in the act creating the office. Acts 1835-36, c. 23.

Commissioners for the hospital for the insane. Acts 1837-38, c. 128.

Professor of mineralogy, geology, and chemistry in the university of Nashville, and assayer for the State, appointed in the act. Acts 1837-38, c. 142.

A board of commissioners for the improvement of the navigation of rivers in Tennessee east of Knoxville, to be appointed by the general assembly. Acts 1837-38, c. 236.

Return J. Meigs and William F. Cooper appointed to digest the general statutes of the State. Acts 1851-52, joint resolution No. 26.

Return J. Meigs appointed State librarian, to hold his office at the pleasure of the general assembly. Acts 1855-56, c. 152.

Return J. Meigs and William F. Cooper appointed by statute to superintend the printing of the Code of Tennessee. Acts 1857-58, c. 177.

Code of 1858, which was prepared by Return J. Meigs and William F. Cooper, authorized the general assembly, by joint vote of both houses, to elect a State

geologist and mineralogist (sections 253 and 254); common school commissioners (section 963); public printer of the State (section 1), which was done for many years.

William G. Brownlow and others appointed trustees of east Tennessee university. Acts 1867-68, c. 88.

Turnpike commissioners appointed. Acts 1868-69, c. 24.

E. T. Seay and others appointed commissioners to organize Trousdale county and hold an election for that purpose. Acts 1870, c. 27.

The governor, secretary of State, comptroller, Robert McKinney, Francis B. Fogg, and Archibald Wright appointed commissioners to lease delinquent railroads. Acts 1870, c. 93.

And during that time, the general assembly, by statutes enacted for that purpose, appointed trustees for educational and other institutions of the State, officers of towns and cities, and directors and other officers of numerous private corporations. These officers were recognized by the executive and judicial departments, and there is no evidence that their official authority was ever challenged, or the power of the legislature to enact the laws called in question.

We now come to the constitution under which the amendatory act was passed, that adopted in 1870.

It provides that the governor, members of the general assembly, judges of the supreme court, the circuit and chancery courts, and other inferior courts, dis-

trict attorneys, clerks of the courts other than those of the supreme and chancery courts, sheriffs, trustees, and registers shall be elected by the qualified voters of the State; that the general assembly shall appoint, by the joint vote of both houses, the secretary of State, treasurer, and comptroller of the treasury; and that "the election of all officers, and the filling of all vacancies, not otherwise directed or provided for by this constitution, shall be made in such manner as the legislature shall direct." The supreme court is authorized to appoint the attorney-general and reporter and its clerks; chancellors are authorized to appoint clerk and masters; and the justices of the counties to elect coroners and rangers and to fill vacancies in the offices of sheriff, trustee, register, and the clerk of the county court.

The governor is authorized to appoint an adjutant general and his other staff officers, and fill certain vacancies, as in former constitutions. Const. 1870, art. 2, sec. 3; article 3, secs. 2, 14; article 6, secs. 3, 4, 5; article 7, secs. 1, 2, 3, 4; article 8, sec. 2.

The general assembly, since the adoption of this constitution, has exercised, without objection from any source, the appointing power, filling existing statutory offices, and others created by it, by joint vote of the two houses, or in the act creating the office, and in other cases conferring the power on the governor and other officers.

Among the officers so elected were the public printer, State librarian, State superintendent of public instruc-

tion, registers of the land offices, and trustees of public institutions; and some of the acts in which the power was exercised directly, or conferred on others, are the following:

. Acts appointing certain citizens, therein named, commissioners to organize the new counties of Crockett, Moore, James, and others, and authorizing them to hold elections for that purpose. Acts 1870-71, c. 16; Acts 1871, cc. 16 and 96.

An act creating an insurance commissioner, and appointing the treasurer *ex officio* commissioner. Acts 1873, c. 23.

An act appointing the governor, secretary of State, comptroller of the treasury, and treasurer a board of commissioners to superintend the completion of the capitol grounds. Acts 1873, c. 37.

An act appointing the governor president of the normal school board. Acts 1875, c. 90.

A resolution appointing H. M. Polk and others trustees of east Tennessee university. Acts 1875, joint resolution No. 53.

An act appointing the secretary of State, comptroller of the treasury, and treasurer, a board of inspectors of the penitentiary. Acts 1883, c. 171.

An act appointing John M. Lea and others commissioners to superintend the construction of the West Tennessee Hospital for the Insane. Acts 1885, c. 74.

An act appointing William E. Tilson, Frank H. Hannum, and David White commissioners on the part of

Richardson v. Young.

Tennessee to fix the line between this State and North Carolina.   Acts 1885, c. 80.

An act appointing the comptroller of the treasury, attorney-general of the State, and three ex-Confederate soldiers, to be suggested by the Tennessee division of Confederate veterans, commissioned by the governor, a board of pension examiners.   Acts 1891, c. 64.

An act creating a State board of railroad assessors, providing that they shall be elected by the general assembly.   Acts 1895, c. 121.

An act creating a state text-book commission, and appointing the governor, State superintendent of public instruction, together with three members of the State board of education, to be named by the governor, to select and adopt a uniform series or system of text-books.   Acts 1899, c. 205.

An act creating a state library commission, and appointing the governor, the chief justice of the supreme court, and attorney-general, commissioners, with power to elect or choose a librarian for the State.   Acts 1901, c. 52.

An act creating a State board of entomology, constituting as members thereof the commissioner of agriculture, the State entomologist, and plant pathologist. Acts 1905, c. 466.

An act appointing a committee to locate a horticultural and experiment station in West Tennessee, naming the governor a member, and authorizing him to appoint two others.   Acts 1907, c. 86.

An act creating a bureau, to be known as the "State geological survey," which shall be under the direction of a commission to be known as "the State geological commission," composed of the governor, the State commissioner of agriculture, the State mine inspector, the president of the University of Tennessee, the chancellor of Vanderbilt University, and the vice chancellor of the University of the South.    Acts 1909, c. 569.

While the governor has, for many years since the constitution of 1834, had the power of appointment to many offices created by the general assembly, in every case it has been conferred by statute, and in all important offices divided with the senate.

After a careful consideration of the provisions of the present constitution, and the constitutional history of the State, we are unable to find any warrant or support for the contention that the power of appointment to office is an executive function which falls to the governor under the provisions distributing the powers of government and vesting in him the supreme executive power.

The constitution commits the power of appointment of certain constitutional officers to each of the departments.   The legislature is vested with the most important appointive power not reserved to the people; the courts with that next in order of importance; and that of the executive is confined to the appointment of an adjutant general and his staff officers, and filling temporarily certain vacancies.   The election of all officers

Richardson v. Young.

and filling all vacancies, not expressly provided for, is committed to the legislature, to be exercised as it may direct. The whole appointive power is thus expressly disposed of, and there is nothing left for implication or construction.

The provisions of the former constitutions, in this respect, were substantially the same, the only material difference being that under them the legislature was vested with much more power of appointment. The legislature, under the broad powers given it in the first constitution, and those vested in it by article 7, section 4, of the last two constitutions, has always exercised the power of appointment to office created by statute, or conferred it upon the people, the courts, the governor, and others, as it deemed best. The governor has accepted and exercised the power of appointment when conferred upon him absolutely, or jointly with the senate. There is not only an utter absence in the constitution and the constitutional and legislative history of this State of anything that indicates that the power of appointment was considered an executive function, or that it was intended, except where expressly stated, to be vested in the governor. On the contrary, there is much to show that the framers of our organic law did not so treat it, or intend to so vest it. We have no difficulty in coming to the conclusion that this power, under the constitution of this State, is not an executive function, inherently in the executive department when not otherwise expressly vested, but

a political power, which, consistently with the distribution of powers of government, may properly be vested in either the legislative, executive, or judicial departments by the general assembly.

This conclusion also disposes of the further insistence that the general assembly cannot empower its members to fill a statutory office.

The power being, as we have held, political, and not executive, it may be conferred upon either of the departments without violating the constitutional prohibition relied upon.

We are also of the opinion that article 7, section 4, of the constitution, expressly authorizes the legislature to exercise the appointing power by legislative act, or in joint session of the members of the two houses. There is no limitation of the agencies it may employ; and it has been held that, where the constitution authorizes the legislature to direct a thing to be done, upon the principle that the greater power includes the less, it may do the thing to be directed. *Redistricting Cases,* 111 Tenn., 234, 291, 292, 80 S. W., 750; *Luehrman* v. *Taxing District,* 2 Lea, 440, 444.

The members of the convention that framed the present constitution well knew that the legislature had been exercising the power of appointment to office for thirty-five years, and we must presume that they understood that article 7, section 4, authorized it and intended to continue it, when they placed the same clause in the new constitution in substantially the same

language, or they would have in some way forbidden it.

Hon. John C. Brown was president of the convention of 1870, and immediately after its adoption held the office of governor for two terms. During his administration the legislature continued to exercise the power as before, and he approved the legislation enacted for that purpose.

This practical and contemporaneous construction of article 7, section 4, covering a period of more than seventy-five years, were the question one of doubt, would, we think, settle it in favor of the validity of the power of the legislature. So well recognized was the authority of the legislature to exercise this power that the governor did not challenge it in vetoing the act here assailed, and approved another act which the general assembly at the same session passed, creating a bureau to be known as the "State Geological Survey," and controlled by the State board of geological commissioners, and appointing the governor, commissioner of agriculture, State mine inspector, the president of the University of Tennessee, chancellor of Vanderbilt University, and vice chancellor of the University of the South, commissioners. Acts 1909, c. 569.

Judge Cooley, upon the weight to be given practical contemporaneous construction of the constitutions of the States, says:

"But where there has been a practical construction, which has been acquiesced in for a considerable period, considerations in favor of adhering to this construction

sometimes present themselves to the courts with a plausibility and force which it is not easy to resist. Indeed, where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention."

Also, in *Baltimore* v. *State,* supra, it is said:

"It has also been generally held that contemporaneous interpretation furnishes reliable light as to the meaning of a clause otherwise involved in obscurity or doubt. 'Contemporaneous expositions of doubtful provisions in all instruments, and particularly in legislative enactments and constitutional charters, are held to be legitimate and useful sources of construction.' "

And in *Den* v. *Hoboken Land Co.,* 18 How., 280, 15 L. Ed., 372, Mr. Justice Curtis says:

"This legislative construction of the constitution, commencing so early in the government, when the first occasion for this manner of proceeding arose, continued throughout its existence and repeatedly acted on by the judiciary and the executive, is entitled to no inconsiderable weight upon the question whether the proceeding adopted by it was 'due process of law.' "

The courts of last resort of other States, construing provisions in the constitutions of those States similar to article 7, section 4, have held that the legislature

Richardson v. ·Young.

could either exercise the power directly by legislative act or that its members could do so in joint session.

In *Ex parte Gerino,* 143 Cal., 414, 77 Pac., 167, 66 L. R. A., 249, it is said:

"The legislature has power to establish offices in addition to those created by the constitution itself. Section 4 of article 20 provides that '. . . all officers . . . whose offices or duties may hereafter be created by law, shall be elected by the people, or appointed, as the legislature may direct.' This gives the legislature power to declare the manner in which officers other than those provided by the constitution shall be chosen. Such officers may be appointed by the legislature itself, or the duty of appointment may be delegated and imposed upon some other person or body. *People* v. *Provines,* 34 Cal., 541; *In re Bulger,* 45 Cal., 559. There is no limitation to any particular person or class of persons upon whom alone the legislature may impose this obligation."

In *Americus* v. *Perry,* 114 Ga., 881, 40 S. E., 1008, 57 L. R. A., 230, Cobb, J., speaking for the court, says:

"While the power to appoint public officers is in a great many instances lodged in some officer of the executive department, this is not now, and never has been, true in reference to all public officers. The history of this State will show that public officers have been chosen by the general assembly and also have been chosen by various judicial officers of the State. This court has, and always has had, the power to appoint

its own officers, and a similar power is vested in the judges of many inferior tribunals. There is nothing in the legislative or judicial history of this State which would indicate that the power of appointment to office was to be treated as purely executive in its nature. An examination of the acts passed by the general assembly from the earliest history of the State down to the present time will show that in many instances the power to appoint officers has never been vested exclusively in the executive department, but has been from time to time vested in the judicial department, and has been exercised, directly or indirectly, by the legislative department; and there are many instances of legislation where powers apparently belonging to one department have been held properly exercisable by another department, as stated in *Beall* v. *Beall,* that the separation of the three departments cannot, from the nature of things, be total. If the general assembly may exercise the power to appoint an officer by providing the manner in which such officer shall be chosen, we see no good reason why it cannot exercise this power directly by naming the officer in the act creating the office."

In *People* v. *Hurlbut,* 24 Mich., 64, 9 Am. Rep., 103, it is said:

"If the legislature had the power to provide the time and manner of the appointment, and were not confined to providing for the appointment by the local authorities, then they had the power to provide that it should be made by the governor with or without the consent

of the senate, or by the legislature in joint convention, or, finally, by the legislature in the very form and manner which was adopted. And if they had the power to direct that it should be made in this way, it would be very difficult to give any substantial reason why they could not proceed to make the appointment as they did, without first passing an act providing that it should be so made. Such an act would be but a legislative determination that the appointments should be so made; and the actual making of it in this way shows the like legislative determination. A similar exercise of power by the legislature has been upheld by the supreme court of New York. *People* v. *Bennett,* 54 Barb. [N. Y.] 480."

To the same effect are the cases hereinabove cited on another question, viz.: *People* v. *Langdon,* 8 Cal., 17; *People* v. *Freeman,* 80 Cal., 233, 22 Pac., 173, 13 Am. St. Rep., 122; *Atty. Gen.* v. *Bolger,* 128 Mich., 355, 87 N. W., 366; *Sturgis* v. *Spofford,* 45 N. Y., 446; *Fox* v. *McDonald,* 101 Ala., 51, 13 South., 416, 21 L. R. A., 529, 46 Am. St. Rep., 98; *Cunningham* v. *Sprinkle,* 124 N. C., 642, 33 S. E., 138; *Cherry* v. *Burns,* 124 N. C., 761, 33 S. E., 136; *Sinking Fund Com'rs* v. *George,* 104 Ky., 260, 47 S. W., 779, 84 Am. St. Rep., 454; *Cox* v. *State,* 72 Ark., 97, 78 S. W., 756, 105 Am. St. Rep., 17.

The contrary is held in some of the cases cited by complainants as sustaining their contention that the appointive power is an executive function; but we think we have reached the proper conclusion, and are

sustained by a majority of the adjudged cases involving this direct question.

Complainants also assail the constitutionality of the amendatory act, upon the ground that sections 3 and 4, amending sections 4 and 8 of the original act (chapter 435, Acts of 1907), requiring the members of the State board of elections and the commissioners of elections for the several counties, to be elected or appointed .from the two political parties most numerously represented in this State, and vacancies to be filled from the party to' which the former officer belonged, and vesting in the members of the two boards certain powers not given them by the original act, violate article 1, section 4, of the constitution, providing "that no political or religious test, further than an oath to support the constitution of the United States and of this State shall ever be required as a qualification to any office or public trust under this State."

The complainants, upon this record, have no interest in this question, and cannot call for a determination of it, unless, if sustained, the effect would be to render the entire act void. They are not interested in these particular amendments as taxpayers, because no burdens are imposed by them, nor as citizens, since they are not affected in any way not common to all the citizens of the State. *Patton* v. *Chattanooga,* 108 Tenn., 197, 65 S. W., 414.

We are of opinion that, if these amendments were invalid, the act would be valid as to other matters. The

amendatory act was enacted for two distinct purposes, sought to be accomplished by amending different sections of the original act. Section 1 amends the same section of the original act, so as to take from the governor the power to appoint the members of the State board of elections, and vest it in the members of the general assembly; while sections 3 and 4 amend sections 4 and 8 of the former act in relation to the persons to be appointed members of the State board and commissioners of elections. The first amendment concerns the appointing power, and the second the appointees. These are separate and independent matters. The object of either amendment can be accomplished without the aid of the other. The change of the appointive power does not affect the character of the person to be appointed. The board will be governed by the provisions of the old act in making appointments if sections 3 and 4 of the last act are invalid.

It is well settled that, where the provisions of a statute are severable and independent, as here, the invalidity of one provision will not vitiate those that are valid.

In *Reelfoot Lake Levee Dist.* v. *Dawson,* 97 Tenn., 179, 36 S. W., 1048, 34 L. R. A., 725, Caldwell, J., said:

"It is not every act with unconstitutional provisions that must fail *in toto.* If, notwithstanding and without such provisions, there be left enough for a complete law, capable of enforcement and fairly answering the object of its passage, the courts will reject only the void parts and enforce the residue."

This principle is well established. *Tillman* v. *Cocke,*
9 Baxt., 429; *State* v. *Trewhitt,* 113 Tenn., 561, 82 S.
W., 480; *Turnpike Co.* v. *Telephone Co.,* 118 Tenn., 88,
92, 99 S. W., 373.

The same question arose in the case of *State* v. *Wash-
burn,* supra, which involved the constitutionality of a
statute authorizing the governor of Missouri to appoint
election commissioners, containing a provision requir-
ing him to appoint a part of them from a list nominated
by a political committee, and while the latter provision
was held void the act was sustained.

It is there said:

"The point is advanced that, if the act of 1899 is un-
constitutional in the particular named, the whole act is
void, and the incumbent had no title to the office. The
power attempted to be conferred on the partisan com-
mittee is not an essential element in the whole act.
Where the part of an act that is unconstitutional does
not enter into the life of the act itself, and is not es-
sential to its being, it may be disregarded, and the
rest remain in force. That is this case."

Therefore, since the determination of this question
would not affect the rights of the parties to this cause,
we will, under the rule of courts not to pass upon the
constitutionality of a statute, when not required for
the decision of the case, refrain from expressing any
opinion upon the merits of this contention.

We now come to the assault made by the complain-
ants upon the election of the defendants by the joint

vote of both houses of the general assembly, and their subsequent appointment by the secretary of State, comptroller, and treasurer. The question here arises whether, since the statute has been held constitutional, the case is resolved into a contested election. If so, the chancery court had no jurisdiction. *Shields* v. *Davis,* 103 Tenn., 539, 53 S. W., 948. But, as this is not pressed, on account of the importance of the questions involved, we will dispose of them. We will consider the objections to the election first.

Section 1 of the act provides that the members of the State board of elections shall be elected by joint vote of both houses of the general assembly.

Section 2 provides the manner of election in these words:

"That the members of the first State board of elections shall be elected prior to the first Monday of April, 1909, upon a date to be fixed by joint resolution of the general assembly, and thereafter during each biennial session of the general assembly one member of each board shall be elected on such date prior to the first Monday of April as may be fixed by joint resolution of both houses of the general assembly."

Complainants insist that the election of the defendants by the members of the general assembly in joint convention was void, because the day for making the same had not been previously fixed by joint resolution, as provided by this section of the act, and there was not present in the joint session a constitutional quorum of two-thirds of the members of the senate.

Richardson v. Young.

The conceded facts are: That a joint resolution, originating in the senate, fixing February 27, 1909, for the meeting of both houses in the hall of representatives at 10 a. m., for the election of a comptroller, treasurer, secretary of State, members of the State board of elections, and members of boards of primary election commissioners, was adopted by both houses, constitutional quorums being present in each, signed by the speakers of the senate and house, and transmitted to the governor for his consideration, which, on February 26th, he returned with a message in writing disapproving and vetoing the same.

That on the night of February 25th thirteen of the thirty-three senators, for the purpose of defeating the election of members of the State board of elections, left the State, and remained absent until the elections hereinafter stated were made.

That a majority of the members of both the senate and house met in joint session in pursuance of the resolution of February 27, 1909, and adjournments were had from day to day until March 3, 1909, when the joint convention proceeded, without a constitutional quorum of the senate, to elect all the officers mentioned in the resolution. There were then present twenty senators and eighty-four representatives, or one hundred and four senators and representatives of the one hundred and thirty-two members of the general assembly, and the defendants each received seventy-two votes, a majority of the members present and of the general assembly.

Richardson v. Young.

When the joint session was about to proceed to the election, and at all times previous thereto, when proper points of order were made, and persistently insisted upon, that the joint session could not proceed for the want of a valid joint resolution fixing the day, the one passed having been vetoed by the governor and not passed over his veto, and that there was not a constitutional majority of the senate present, they were overruled by the president of the joint session.

Complainants now insist that the election, for these reasons, is void and of no effect.

We are of the opinion that the action of the governor in vetoing the joint resolution did not affect the validity of the election.

· The provision in the act that the day of the election be fixed by joint resolution is not mandatory, but merely directory, and all that is necessary is that a time and place for the election be definitely fixed by the two houses of the general assembly. The substance of the requirement is that a certain day and place for the joint convention be agreed upon by the senate and house, and when this has been done a failure to make the agreement in a particular form, or other similar irregularity in assembling, will not defeat an election otherwise valid.

The case of *Winston* v. *Railroad Co.*, 1 Baxt., 78, involved the validity of an election held for the purpose of authorizing Sumner county to subscribe to the capital stock of a railroad company, which it was in-

sisted was void because certain things required by the
statute had not first been done, this court, in determin-
ing whether those requirements were mandatory or
directory, said:

"The principle on which courts construe a statute
as directory merely, is very well stated by Mr. Cooley
(Const. Limit., 77-78) : 'Those directions which are not
of the essence of the thing to be done, but which are
given with a view merely to the proper, orderly, and
prompt conduct of the business, and by the failure to
obey which the rights of those interested will not be
prejudiced, are not commonly regarded as mandatory,
and if the act is performed, but not in time or in the
precise mode indicated, it may be still sufficient, if that
which is done accomplishes the substantial purpose of
the statute.   But the rule presupposes that no negli-
gent words are employed in the statute which expressly
or by necessary implication forbid the doing of the act
at any other time or in any other manner than as di-
rected.'   In other words, that the means to the attain-
ment of the end, if in minor particulars be neglected,
or not strictly followed, shall not defeat the end, or
the result sought by the statute."

In Lewis' Sutherland Statutory Construction, sec-
tion 610, the rule is stated in these words:

"The consequential distinction between directory and
mandatory statutes is that the violation of the former
is attended with no consequences, while the failure to
comply with the requirements of the other is productive

of serious results. This distinction grows out of a fundamental difference in the nature, importance, and relation to the legislative purpose of the statutes so classified. The statutory provisions which may thus be departed from with impunity, without affecting the validity of statutory proceedings, are usually those which relate to the mode or time of doing that which is essential to effect the aim and purpose of the legislature or some incident of the essential act."

It is further said by this same author (section 612):

"Provisions regulating the duty of public officers and specifying the time for their performance are in that regard generally directory. Though a statute directs a thing to be done at a particular time, it does not necessarily follow that it may not be done afterward. In other words, as the cases universally hold, a statute specifying the time within which a public officer is to perform an official act regarding the rights and duties of others is directory, unless the nature of the act to be performed, or the phraseology of the statute, is such that the designation of time must be considered as a limitation of the power of the officer. And it was accordingly held that a brigade order, constituting a court-martial, issued in July, when by the militia law it was made the duty of the commandant of the brigade to issue such order on or before the 1st day of June in every year, was valid. A provision that an appeal bond be executed before an appeal is perfected, when not a part of the essential steps to take an appeal, is di-

122 Tenn—34

rectory. So is a provision that an officer shall take his official oath within a certain period, or give his official bond, even where the issue of a commission to him is prohibited until such bond is given; for it would be attended with mischievous consequences if in such cases all the official acts of such delinquent were held void. His acts, if he in fact filled the office, would doubtless be valid. There would be no collateral inquiries affecting the right of a *de facto* officer to act. A statute which provides that commissioners to locate a county seat shall meet at a time and place provided for, that a majority shall constitute a quorum to do business, 'and that the commissioners may adjourn to some other place or time, and may adjourn from time to time until the business before them may be completed,' is directory merely, and the commissioners have the power to elect a chairman and empower him to fix the time of the next meeting."

In *Covington's Case*, 29 Ohio St., 117, it is said:

"The difference between a mandatory and a directory provision is often determined on grounds of expediency; the reason of this being that less injury results to the general public by disregarding than by enforcing the letter of the law."

As already said, the substance of the requirement of the statute is that an election be made by the joint vote of the general assembly—that is, in joint convention of the members of the two houses—and that the time and place for such convention be fixed so that all members

can be present, and there can be no advantage taken of any one. The provision for the manner in which the day is to be fixed is merely for the proper and orderly conduct of the business, and the form of the agreement to act cannot possibly affect the election, or the right of any one interested in it. The general assembly did not intend to give the governor any control over the election; but, on the contrary, the amendatory act had been passed expressly to take from him that control, and vest it solely in the members of the general assembly. We cannot conceive of a stronger case for construing a provision of a statute directory than the one here presented. The agreement of time and place for the meeting is the substance of the thing required. The form in which it is made is immaterial. It can neither help nor prejudice any one. To allow an election to be defeated by the failure to use a certain form in making the agreement of the time and place for holding the convention, a mere irregularity in no way prejudicing any one, would be to allow that which is not of the essence of the law to defeat and destroy the substance, the end to be effected.

But the joint resolution was not one which article 2, section 18, of the constitution requires to be presented to the executive, and which cannot become effective without his approval, or adoption notwithstanding his veto. That provision only concerns resolutions or orders, which are legislative in their character, and does not relate to those in regard to mere matters of

formal procedure, of which the senate and house have exclusive control. There seems to be no conflict of authorities as to this.

The constitution of the United States (article 1, section 7) provides that "every order, resolution, or vote, to which the concurrence of the senate and house of representatives may be necessary (except on the question of adjournment), shall be presented to the president of the United States, and before the same shall take effect shall be approved by him, or, being disapproved by him, shall be passed by two-thirds of the senate and house of representatives, according to the rules and limitations prescribed in the case of a bill," which, while very similar to section 18 of article 2 of the constitution of this State, is broader, in that the requirement covers, not only every resolution and order, but every vote to which the concurrence of the senate and house of representatives are necessary.

This provision has always been construed to include only resolutions which are legislative in their character, and it has never been the practice of the congress of the United States to present to the president for his approval, concurrent resolutions, orders, or votes in regard to matters not legislative.

The question first arose in 1798, when the concurrent resolution submitting the eleventh amendment to the constitution of the United States to the several States for adoption was challenged, because not presented to the president, as supposed to have been required by ar-

ticle 1, section 7, of the constitution, and it was held that the negative of the president was confined to ordinary cases of legislation, and that he had nothing to do with a resolution of that kind. *Hollingsworth* v. *Virginia,* 3 Dall., 381, 1 L. Ed., 644.

The subject of joint and concurrent resolutions was considered in a report of the judiciary committee of the senate of the United States, submitted and adopted January 27, 1897, in which it is said:

"We conclude this branch of the subject by deciding the general question submitted to us, to wit, 'whether concurrent resolutions are required to be submitted to the president of the United States,' must depend, not upon their form, but upon the fact whether they contain matter which is properly to be regarded as legislative in its character and effect. If they do so, they must be presented for his approval; otherwise, they need not be. In other words, we hold that the clause in the constitution which declares that every order, resolution, or vote must be presented to the president, to 'which the concurrence of the senate and house of representatives may be necessary,' refers to the necessity occasioned by the requirement of the other provisions of the constitution, whereby every exercise of 'legislative powers' involves the concurrence of the two houses; and every resolution not so requiring such concurrent action, to wit, not involving the exercise of legislative powers, need not be presented to the president. In brief, the nature or substance of the resolution, and

not its form, controls the question of its disposition."
4 Hinds' Precedents of the house of representatives,
secs. 3482-3483.

The constitution of Kentucky (section 89) contains
a provision almost identical with that of the federal
constitution upon this subject.  The legislature of that
State enacted an act authorizing the members of the
two houses to elect penitentiary commissioners by a
joint vote, and, notwithstanding the act did not require
the day of election to be fixed by the joint resolution,
such a resolution was adopted, and on being presented
to the governor for approval, was vetoed.   The legis-
lature then proceeded, as in this case, without more,
to hold the election, and its validity was attacked in
the courts.   The case reached the court of appeals of
Kentucky, and, as it is particularly applicable to the
one under consideration, we quote from the opinion of
that court at some length:

It is there said:

"It is claimed that the commissioners could not have
been elected except by the respective bodies of the gen-
eral   assembly,   in   their   separate   capacity,   the
senate and house concurring therein; that the joint
resolution authorizing a meeting of the joint assembly
for the purpose of electing the commissioners should
have been approved by the governor before it went into
effect; and that the vote cast in the election of the
commissioners, also, should have been approved by
him.   The act authorized the general assembly to elect

the commissioners on or before the 10th of March, 1898, regardless of the wishes of the governor. It was passed over his objections. By the terms of the act, it could meet at any time on or before that date. By a motion in each house a time could have been designated when the members of the general assembly could meet in joint session to elect the commissioners. The joint resolution simply answered the purpose of such motion. That being the purpose of the joint resolution of the two houses, it certainly was not necessary to obtain the approval of the governor, because the general assembly had, by the passage of the act, been empowered to elect the commissioners. The governor could not invalidate the election by his disapproval of the result. The act gave him no voice in the election. Had the general assembly intended that the election of the commissioners should be subject to the approval of the governor, it would have probably conferred upon him the right to appoint them. We are of the opinion that any action, either by motion, order, or resolution, which the senate and house might have taken with a view of meeting in joint session to elect the commissioners, could be done without presenting it to the governor. The governor's official connection with the matter ceased when the bill became a law. We are of the opinion that section 89 of the constitution was not violated when the general assembly proceeded to the election of the commissioners without the approval of the governor. The bill became a law on the 5th day of March,

1898, five days before the last day upon which the election should take place. If the views of counsel for appellants are correct, the governor could have prevented an election under the act, and thus destroyed it, by simply holding for six days a resolution fixing the time when the general assembly should meet in joint session to elect the commissioners. He could not prevent the bill from becoming a law by vetoing it, he could defeat its operation by failing to approve the resolution, or the result of the vote. We cannot agree that counsel's view on the question is correct. The commissioners received a majority of the votes of both houses, and of each house, and were duly elected." *Sinking Fund Com'rs* v. *George,* 104 Ky., 260, 47 S. W., 779, 84 Am. St. Rep., 454.

There are a number of other cases substantially in accord with those from which we have quoted, but we will merely refer to them: *Haight* v. *Love,* 39 N. J. Law, 14; *Erwin* v. *Mayor,* 60 N. J. Law, 141, 37 Atl., 732, 64 Am. St. Rep., 584; *State* v. *City of Duluth,* 53 Minn., 238, 55 N. W., 118, 39 Am. St. Rep., 595; *Rich* v. *McLaurin,* 83 Miss., 95, 35 South., 337.

A joint resolution fixing the date for the election of officers is not in any sense legislative, but concerns political functions solely within the jurisdiction and control of the legislature, or the members thereof, in regard to which the governor has no authority or duty to perform. There could be no possible reason for giving him notice of an election or obtaining his consent or ap-

proval of an agreement fixing the date for holding it. He has absolutely nothing to do with the election.

The fact that the resolution was presented to the governor and disapproved did not destroy it.

When it was duly passed, as it was, the law was fully complied with, and what happened afterwards was immaterial, and cannot affect the validity of the resolution, or the election made under it.

Complainants' further contention is that the joint convention had no power or authority to proceed to elect officers, because of the absence of a constitutional quorum of the senate, and is based upon section 11, article 3, of the constitution, providing that "not less than two-thirds of all the members to which each house shall be entitled shall constitute a quorum to do business."

Defendants' answer to this objection is that the constitutional provision relied upon applies exclusively to the two houses when convened as the senate and the house of representatives for the purposes of legislation, or doing other business which each, as a separate house, has the power to do, and not when their members meet in joint convention for political purposes.

There is no provision of the constitution, nor statute, expressly providing for joint conventions of the members of the general assembly, or governing their proceedings, except a statute relating to conventions called to elect United States senators, and these are really controlled by an act of congress; but the provisions of

the constitution providing that the comptroller, secretary of State, and treasurer be elected by a joint vote of both houses of the legislature, and the statute requiring these officers to be elected by the joint ballot of the two houses, by implication, clearly authorize them for election purposes, and it has been the uniform custom to elect these officers, and others created to be elected by the general assembly, in joint convention from the earliest history of the State.

These conventions are deliberative bodies, and, their organization and proceedings not being regulated by any statute, it would seem, like all other such bodies, they would have the power to elect their own officers, and adopt their own rules and be governed by established parliamentary usages and laws, one of which is that a majority of the members constitute a quorum to do business, and a majority of that majority controls and has the power to do the work of the whole. *Lawrence* v. *Ingersoll*, 88 Tenn., 62, 12 S. W., 422, 6 L. R. A., 308, 17 Am. St. Rep., 870.

They are not a part of the legislative department, and have no legislative powers. Legislation can only be done while the two houses are acting separately in their respective chambers. Their sole power is the political function of electing officers, and then only when that power is expressly delegated to their members. They are merely electoral colleges, composed of the members of the two houses, and have no greater power than if they were composed of judges, or other officers, to whom the power of election had been delegated. It

is said by a distinguished judge that "the joint convention is a body as different and with as distinct powers and functions from those of the two separate houses as a partnership is from the individuals composing it." *Prouty* v. *Stover*, 11 Kan., 256.

Joint conventions are not composed of the senate and the house of representatives, but of the members of the general assembly, without regard to the house to which they were elected. The senate, while acting as a separate body, although its members number only one-third of the house, has equal power with the latter, and can reject any measure passed or proposed by it. Thus each senator exercises in all legislation the power of three representatives; but this power is lost in a joint convention. There they meet the members of the house upon an equality, as members of the convention; all having the same authority and only one vote. They are not governed by the rules of the house to which they belong, but by those of the convention.

The only general statutory provision relating to the election of officers by joint conventions is article 1, c. 2, of Shannon's edition of the Code, entitled "Elections by the General Assembly." The first section of this article is as follows:

"Sec. 1136. The following officers are appointed, or elected, by joint ballot of the two houses of the general assembly: The secretary of State, the treasurer, the comptroller, the senators in congress of the United States."

Following this, in the same article, the manner of electing senators is fixed in these words:

"Sec. 1138. The place of choosing said senators shall be the hall of the house of representatives.

"Sec. 1139. The manner of choosing them shall be by the joint vote of the two houses of the legislature assembled in convention, by a majority of which the choice shall be determined."

The act of congress upon this subject, here inserted for convenience by Mr. Shannon in his edition of the Code, as section 1141, provides that each house, before meeting with the other in convention, shall name one person for senator, and when the two houses are convened, if the same person has received a majority of all the votes in each house, he shall be declared elected senator; "but if the same person shall not have received a majority of the votes in each house, or if either house shall have failed to take proceedings as required by this section, the joint assembly then shall proceed to choose, by a *viva voce* vote of each member present, a person for the purpose aforesaid, and the person having a majority of all the votes of the said joint assembly, a majority of all the members elected being present and voting, shall be declared duly elected."

Whether this language required that a majority of each house, or a majority of both houses—in other words, a majority of the entire membership of the general assembly, regardless of to which house they were elected—be present in order to constitute a lawful convention to elect a senator, it is clear that it does

not require a constitutional quorum of two-thirds of each house to be present for that purpose.

Could it have been contemplated that a minority of the senate, after a joint convention had been agreed upon by both houses acting separately, with constitutional quorums, should have the power to block the action of the joint convention, and defeat the election of constitutional officers, merely by absenting themselves from the convention? It is difficult to believe that the framers of the constitution intended that such minority should have this power to control, not only the majority of that house, but also the entire membership of the other house in that way.

It is also to be noted that, while the constitution provides that a minority of either house may be authorized by law to compel the attendance of absent members, there is no provision to compel their attendance in joint convention, and it would be in the power of thirteen senators in this State to defeat all elections by the legislature, if a quorum was required.

These considerations strongly support the position of the defendants that the provisions of the constitution prescribing the number of members necessary to constitute a quorum of each house while acting separately have no application to the organization of joint conventions.

The case of *Snow* v. *Hudson,* 56 Kan., 386, 43 Pac., 260, is relied upon both by the complainants and defendants. This case involved the validity of the election of a State printer by the general assembly, made by

joint convention in the absence of a quorum of the senate, but by a majority of the two houses. The supreme court of Kansas is presided over by three judges, and they all differed as to the law of the case; but the opinion of the chief justice was based upon statute, and he did not express any views upon the question we are considering. Justices Johnston and Allen, concurring, express their views of joint conventions in these words:

"The term 'joint session,' in our view, has a well-recognized meaning, and implies the meeting together and commingling of the two houses, which, when so met and commingled, act as one body. Each member of that body, when it has been once properly and lawfully convened, has equal rights, and his vote has equal weight with that of any other member; and it is beyond the power of the legislature to say that in a session, which the constitution says shall be joint, the vote of a senator shall have greater weight than a vote of a member of the house. The framers of the constitutional provision, and the people who voted for its adoption, are presumed, not only to have understood the meaning of the words they selected, but also the customs of joint conventions which meet in all the States for the election of United States senators, and in many of them for other purposes. Our understanding of the very purpose of making a session joint is to remove the check which each house holds on the other, and to permit the two houses to vote and act as a single body. If the act of 1879 is valid, twenty-one senators may defeat the election of a State printer, al-

though one hundred and twenty-five representatives and nineteen senators vote for the same person. No duty would rest on the senators to yield, because their right to vote for the person of their choice would be equal to that of the other members."

Mr. Justice Johnston was of the opinion that a quorum of the senate was not necessary, but that a majority of all the members of the general assembly was sufficient to constitute a valid joint session, and that, notwithstanding the irregular manner in which it was called, the election made should be sustained.

Mr. Justice Allen was of the contrary opinion, and said:

"The writer is of the opinion that, if a quorum of the senators had actually attended, the mere irregularities of getting together would not have invalidated the proceedings, but that the attendance of a quorum of each house is absolutely essential to the power to act as a joint convention. The constitution vests the power to elect in the legislature in joint session. The legislature consists of a senate and a house of representatives. While all of the members need not be in attendance in order to constitute a valid house and a valid senate, a quorum, which the constitution fixed at a majority, must be present, although the house of representatives contains a large majority of the members of the joint convention. Certainly, it seems to me, that there can be no joint convention until the senate attends. The constitution nowhere in express terms or by any fair implication, confers on the house

of representatives alone, even though every member should vote for the same person, power to elect a State printer. The senate must attend, and the words 'senate' can never mean less than a quorum of the senate."

The case was decided upon another question, and the opinions of the justices are only authority so far as they are sustained by reason and principle.

The separate views expressed by Mr. Justice Allen seem to conflict with those in which he and Mr. Justice Johnston concurred. Can senators and representatives meet and commingle with equal rights as members of a joint convention, an electoral body, and yet be governed by laws applicable to legislative bodies, acting separately, of which they are also members?

While the chief justice was in doubt whether a quorum of both houses was necessary in a joint convention, he approved the case of *Prouty* v. *Stover*, 11 Kan., 256, which also involved the election of a State printer by the general assembly, in which Mr. Justice Brewer, speaking for the court, said:

"Now there are some sections of our constitution which require for specific acts the concurrence of a certain proportion of the members elected to either house: Article 2, sections 13, 14, 27; article 3, section 15; article 11, section 5; article 14, sections 1 and 2. But these sections all refer to the actions of the two houses meeting in separate session. They prescribe the number of votes in each house which shall be necessary for certain purposes. They nowhere and in no manner refer to the action of the two houses meet-

ing as one body in joint session. The joint convention is a body as different, and with as distinct powers and functions from those of the two separate houses, as a partnership is from the individuals composing it. Even if it were conceded that these sections cited operated as an implied prohibition on any statutory limitation of the power of a majority of a quorum in the separate houses, still they would not bear upon the powers of a majority of the quorum of a joint convention. A joint convention is a body not recognized by the constitution prior to the amendment of 1868, unless it be the use of the phrase 'the legislature shall by joint ballot,' in section 2 of article 1."

And again he said:

"But, again, the act of voting is not a legislative act. Giving the election of printer to the legislature in joint convention simply creates an electoral college, composed of the members of the two houses. The powers of the college thus created are no greater than if they had been composed of the probate judges of the several counties convened for that purpose. Shall it be said that limitations placed upon the actions of the several houses when performing their appropriate legislative functions, or certain limited judicial duties, apply either directly or by implication to the powers of an electoral college composed of the members of those houses?"

While the opinion of Mr. Justice Allen is the only

122 Tenn—35

authority cited by complainants to sustain their contention, there are a number holding that, where an election is committed jointly to two separate bodies, a quorum of both is not necessary to make an election valid.

In the case of *Tillman* v. *Otter*, 93 Ky., 600, 20 S. W., 1036, 29 L. R. A., 110, where the facts are sufficiently stated in the opinion, it is said:

"This court is now asked to declare that election invalid, because a majority of the members of the board of aldermen, with its president in the lead, had refused to discharge their duty, and purposely, as their own exhibits filed show, adjourned, or attempted to adjourn, to a period with a view to preventing an election by the general council, and in utter disregard of both public and private interests. They were, however, still in session, with six of the members ready to act with the other board. They did act, and if the absconding members had remained they could not have prevented the election of the plaintiff, as more than two-thirds of the members of the joint session and of the entire general council voted for him. It is insisted that this body—the general council, acting as the mere agents of the State in election of men to control, as members of the sinking fund, vast sums of money—should be regarded in the light of legislative branches of the government, with the right of a minority to resort to parliamentary rules in order to violate a statute, and prevent an election of those who control a corporation

entirely distinct from the municipal government which gives to the general council its existence. It is conceded that the councilmen and the board of aldermen are distinct, the one from the other, and that in their legislation for the city the rules governing legislative bodies must ordinarily prevail; but here the general council was made the mere agent of the State to select some one to act for, and control the corporation known as the 'Sinking Fund.' This general council was required to hold an election once in each year, in the month of October, for that purpose, and if they had assembled in that month, and elected by a fair majority vote, a member of the board without any resolution to that effect, this court would have held the election good as against a mere usurper; and in this light the defendant must be regarded, under the facts admitted in this case. It is not denied that on the 25th of October, 1889, the plaintiff received eighteen votes from one body, and six from the other, making twenty-four votes in all; and to hold that the plaintiff was not elected under the circumstances, because of the violation of official duty by the majority of the board of aldermen, would be recognizing a rule that no court should be willing to adopt."

The case of *Whiteside* v. *People,* 26 Wend. (N. Y.), 634, involved the election of a county treasurer by the board of supervisors and the judges of the courts of common pleas, in which the latter refused to participate.

The headnote of this case is as follows:

"So where the appointment to office is given to two distinct bodies, and the mode of appointment is directed to be after this manner, each body to meet in its own chamber and make a nomination, both bodies then to assemble in joint meeting and compare nominations, if the nominations agree, the person nominated to be considered as appointed, but if there be no concurrence then the two bodies to proceed to elect by joint ballot from the persons nominated, and an invitation to be given by one body to the other to assemble in joint meeting for the purpose of making a particular appointment, and the two bodies assemble in joint meeting, not for the purpose of making the proposed appointment, but for the transaction of other business, and when thus assembled it is agreed by a majority of voices to proceed to the contemplated appointment, and an announcement of a nomination by one of the bodies be made, and it will be declared, that the other has made no nomination and refuses to act in the matter, the appointment of the officer by a majority of the whole number of both bodies is a valid appointment, although all the members of the body which had omitted to make a nomination leave the joint meeting and take no part in the appointment. The decision in 23 Wendell, 9, is accordingly overruled."

The direct question was presented to the senate of the United States in the election contest of *Davidson* v. *Call*, from Florida.

Call had received the votes of a majority of the members of the joint convention, but at the time of the election a constitutional quorum of the senate was absent. The governor, being of the opinion that there was no election, appointed Davidson senator. The credentials of the two were referred to the committee on privileges and elections. This committee found the facts as here stated, and reported as follows:

"This act [of July 25, 1866] provides that 'the members of the two houses shall convene in joint assembly,' etc. The joint assembly is thus composed, not of the two houses as such; it is not a merger of the two houses into one of either; but it is a body distinct and separate from either as such, and has by the words of the enactment a quorum of its own prescribed and defined, to wit, 'a majority of all the members elected to both houses,' without any reference to a quorum either of the senate or of the house. . . . The term 'legislature' in this clause is not to be construed technically with reference to the separate chambers which may exist within it, but as designated the collective number of all the persons composing it, and that therefore Mr. Call was duly elected."

"February 4, 1892, the senate considered this report and declared Mr. Call lawfully entitled to a seat in the senate." 2 Hinds' Prec. of the House of Rep., sec. 1060. See, also, *Beck* v. *Hanscom*, 29 N. H., 213; and *Kimball* v. *Marshall*, 44 N. H., 465.

The weight of authority seems to be against complainants' contention, but the question must be deter-

mined upon the constitution and laws of this State, regardless of how it may have been settled in other jurisdictions.

The decision of this question, however, is not necessary or determinative of the case, if the appointment of the defendants made by the comptroller, treasurer, and secretary of State after the adjournment of the legislature was valid; for, if complainants' successors have been lawfully elected or appointed, their terms have expired and they have no standing in court. Therefore, conceding, but not deciding, that the election was void for the want of a constitutional quorum of the senate in the convention, and that three vacancies existed in the board during recess, we will determine whether or not they were lawfully filled.

Complainants attack the appointment of the defendants as members of the State board of elections by the comptroller, secretary of State, and treasurer, under section 3 of the amendatory act, upon the ground that the vacancies occurred while the legislature was in session, and that those officers were only authorized to fill vacancies happening during recess of that body.

The part of section 3 of the act, under which the appointment was made, is in these words:

"All vacancies shall be filled as in the first instance, by joint vote of the general assembly, except vacancies occurring when the general assembly is not in session, when if the office of only one member is vacant, an appointment to fill such vacancy shall be made by the

remaining members of the board within thirty days after the vacancy occurs; and provided, further, that in the event the remaining commissioners fail to fill the appointment within the time mentioned, the same shall be filled by the secretary of State, comptroller, and treasurer, or a majority, from the same party in which the vacancy occurred, to hold until the convening of the general assembly; but should there be more than one vacancy on such board, the same shall be filled by appointment of the secretary of State, comptroller, and treasurer, or a majority of those officers."

Complainants construe this to confine the authority of the appointing power to vacancies which take place during recess of the general assembly, while the defendants construe it to mean vacancies that may exist during recess without regard to when the office became vacant.

The office of members of the State board of elections was vacant if the previous election was not valid. When an office is created it is vacant until it is filled. *Condon v. Maloney,* 108 Tenn., 82, 65 S. W., 871; *State v. Akin,* 112 Tenn., 603, 79 S. W., 805; *State v. Glenn,* 7 Heisk., 472.

There is no technical or peculiar meaning to the word "vacant" when applied to office. It means unoccupied, without an incumbent, regardless of whether it was ever filled, or when or how it subsequently became without an incumbent. *Clarke v. Irwin,* 5 Nev., 129.

The words "occur" and "happen" are usually used in referring to vacancies in office, and mean the same thing.

In *Fritts* v. *Kuhl,* 51 N. J. Law, 192, 17 Atl., 102, it is said:

"The word 'happen,' in its strictest literal sense, signifies an unexpected event. It is also not uncommonly used as synonymous with 'occur,' 'take place,' 'exist,' and 'happen to be.'"

Mr. Webster defines the verb "to occur": "To be found or met with"—and the Century Dictionary: "Be found; be met with," and a quotation is given showing that it is synonymous with the word "exist."

In Roget's Thesaurus, in treating of the state of "being," the word "occur" is used as equivalent of "exist."

We think that "occur" or "occurring" means the same as "happen" or "happening," or that both may be used in the sense of "existing" or "to be found," and that this definition has been given them in construing clauses of constitutions and statutes concerning the filling of vacancies.

Complainants do not cite any adjudged cases upon this question, but for authority rely upon the construction given article 1, section 3, of the constitution of the United States, providing for vacancies in the office of senator in these words:

"If vacancies happen by resignation, or otherwise, during the recess of the legislature of any State, the executive thereof may make temporary appointments

until the next meeting of the legislature, which shall then fill such vacancies."

They say:

"The federal constitution provides that, if vacancies 'happen' in the office of senator during a recess of the legislature, the governor may appoint. Article 1, sec. 3. In the cases before the senate there was controversy as to the meaning of the word 'happen.' One view was that it means vacancies caused by fortuitous or uncertain things, and not a vacancy which it is known must happen, as by reason of the expiration of the term on the 3d day of March. But this view was rejected, and it was held that it means a vacancy from any cause. Senator Turley, of Tennessee, submitted the report in Senator Quay's case (and it was adopted), which said:

" '[A vacancy] having "taken place," "occurred" "came to pass," it may continue indefinitely; but it does not continually and momentarily "take place," "occur," nor "come to pass," again and again. Hence a vacancy must begin or commence during a recess of the legislature before the executive can appoint. *Senate Election Cases,* S. 2, ss, 107, 110.' "

We do not think that the words "occur" and "occurring" in this statute should be so construed, but that the intention of the legislature was to provide for vacancies that might exist at any time, regardless of when the office became vacant.

The authority vested in the comptroller, secretary of state, and treasurer was in the interest of the public, and necessary for the effective administration of the

law, and should be given a liberal construction in order to carry out the intention of the lawmakers. This is the view taken of the clause in the constitution of the United States (article 2, section 2), authorizing the president to fill "all vacancies that may happen during the recess of the senate by granting commissions, which shall expire at the end of their next session."

The question early arose whether or not under this clause the president was authorized to appoint to an office which became vacant while the senate was in session and remained vacant until after adjournment of that body.

The president was advised that the word "happen" was synonymous with the word "exist," and that he did have the power to appoint when a vacancy existed without relation to when the office became vacant.

We find this statement in *Fritts* v. *Kuhl,* 51 N. J. Law, 194, 195, 196, 17 Atl., 103, of how the question arose, and was disposed of under different administrations:

"During the administration of President Monroe, in 1823, the question arose whether he had the power to fill, during the recess of the senate, a vacancy which had begun during the preceding session of the senate. During that session the president had made a nomination which the senate refused to confirm, and then adjourned, leaving the office unfilled.

"Mr. Wirt, then attorney-general, advised the president that he had power to fill the vacancy. In his

opinion he says: 'Had this vacancy first occurred during the recess of the senate, no doubt would have arisen as to the president's power to fill it. The doubt arises from the circumstance of its having first occurred during the session of the senate. But the expression used by the constitution is "happen." "All vacancies that may happen during the recess of the senate." The most natural sense of this term is "to chance, to fall out, to take place by accident." But the expression seems not perfectly clear. It may mean "happen to take place"—that is, "to originate"—under which sense the president would not have the power to fill the vacancy. It may also, without violence to the sense, mean "happen to exist," under which sense the president would have the right to fill it by his temporary commission. Which of these two senses is to be preferred?

" 'The first seems to be most accordant with the letter of the constitution; the second most accordant with its reason and spirit. The meaning of the constitution seems to me to result in this: That the president alone cannot make a permanent appointment to those offices; that to render the appointment permanent it must receive the consent of the senate; but that, whensoever a vacancy shall exist which the public interests require to be immediately filled, and in filling which the advice and consent of the senate cannot be immediately asked, because of the recess, the president shall have the power of filling it by an appointment to continue only until the senate shall have passed upon it, or, in the language of the constitution, till the end of the next

session. . . . In reason it seems to me perfectly immaterial when the vacancy first arose; for, whether it arose during the session of the senate or during their recess, it equally requires to be filled. The constitution does not look to the moment of the origin of the vacancy, but to the state of things at the point of time at which the president is called on to act.'

"In 1825 Mr. President Adams adopted this construction of the constitution in the appointment of Amos Binney as navy agent of the port of Boston.

"During the administration of President Jackson, in 1832, Attorney-General Taney gave an opinion in which he accepted the interpretation of his predecessor, and held that the meaning of this clause of the constitution is 'if there happen to be any vacancy during the recess.' To enforce his views, he states instances in which it cannot be imagined that the power to fill the vacancy was intended to be withheld from the president.

"An officer may die abroad or in a distant part of the country, and his death not be known until after adjournment, or a nomination may be confirmed by the senate, and the appointee may refuse to accept after adjournment.

"In 1841 Mr. Legare, attorney-general, expressed a like opinion (Vol. 3, p. 673), which was concurred in by Mr. Attorney-General Mason in 1846. Vol. 4 of Opinions, p. 523.

"In 1855 Attorney-General Cushing, referring to the opinions of his predecessors in office, says:

" 'They have thoroughly demonstrated and conclusively established, as a doctrine of administrative law, that the expression of the constitution, "all vacancies that may happen," signifies "all vacancies that may happen to exist in the recess," or "when there happen to be any vacancies in the recess." And they concur in the general statement that, howsoever a vacancy happens to exist, if it exists it may be filled by temporary appointment of the president. They all agree that it is the true spirit of the constitution to have the offices, which congress indicates to be needful by creating them, filled, though provisionally, rather than remain vacant or force a special call of the senate.' Vol. 7 of Opinions, p. 187.

"To the same effect are the opinions of Attorney-General Bates, in 1862, and Attorney-General Speed, in 1865.

"Mr. Attorney-General Stanberry, in 1866, gave a very elaborate opinion, the conclusion of which was that the president has full and independent power to fill vacancies in the recess of the senate, without any limitation as to the time when they first occurred. Vol. 12 of Opinions, p. 32.

"Mr. Evarts, when attorney-general, in 1868, in a carefully prepared opinion, reached the conclusion that a vacancy occurring while the senate was in session, and continuing, through the failure of the senate to confirm a successor, could be filled by the president during the recess of the senate. Vol. 12 of Opinions, p. 449.

"In 1868 Judge Cadwallader, of ·the United States district court of Pennsylvania, dissented from these views. *Dist. Atty. Case,* 7 Am. Law R·eg.. [N. S.], 786.

"Ten years later Justice Woods, of the United States supreme court, sitting in the Georgia circuit, refused to concur in the opinion of Judge Cadwallader. *Farrow's Case,* 3 Fed., 112.

"And Attorney-General. Devens, in 1880, after an elaborate discussion of the subject, concluded that the opinions of his predecessors, and the practice under them, had settled the construction of the constitution that appointments might rightly be made, though the vacancy first began during the session of the senate, ·and he declared that the contrary view of Judge Cadwallader could not be considered of great authority or weight against these. opinions, and an administrative usage which commenced as early as the time of President Monroe, and in reference to which such usage has been invariable. Vol. 16 of Opinions, p. 522."

. The case from which this is taken is also in point. The governor of New Jersey nominated Richard S. Kuhl to the office of judge of the Hunterdon pleas to fill a vacancy that occurred during the session of the senate. The senate refused to consent to the appointment and·rejected it. No other nomination or appointment was made until after the adjournment of the legislature, when the governor again appointed ·Mr. Kuhl, and his authority to make this appointment was challenged upon the ground that the provision in the constitution of New Jersey that "when a vacancy happens

during the recess of the legislature in any office which is to be filled by the governor and senate, or by the legislature in joint meeting, the governor shall fill such vacancy, and the commission shall expire at the end of the next session," only authorized him to fill vacancies taking place from some cause during recess of the legislature.

In the opinion of the court it is said:

"If, therefore, within the meaning of this paragraph of the State constitution, 'this vacancy happened during the recess of the legislature,' it was the duty of the governor to fill it. The word 'happen,' in its strictest literal sense, signifies an unexpected event. It is also not uncommonly used as synonymous with 'occur,' 'take place,' 'exist,' and 'happen to be.' In its most rigorous meaning, if the contingency implied by it is referred strictly to the time of the occurrence of the vacancy, it will exclude the power of the governor to appoint where an official term expires by its own limitation in the recess; for in that there is nothing uncertain, the time is fixed and definite. On the contrary, it may be said that, while there is no uncertainty as to the point of time when the vacancy will occur in such case, there is uncertainty whether the senate will be in session, and therefore a word implying an unexpected event is properly used. It may also be argued that, if the uncertainty implied by the word 'happens' is as to the senate being in session, the vacancy does not happen then, the time of that is certain, but the senate happens not to be in session, and that the

constitutional clause should be read as follows: 'When it happens that the senate is not in session when there is a vacancy.' This would give the governor power to appoint in all cases of vacancy. These suggestions are made to show that the import of this clause is not free from doubt.

"In order, therefore, to ascertain its true meaning, in accordance with the recognized rules of interpretation, we must seek for the reason and spirit of it, having regard to the effects and consequences of the construction adopted, and the source from which the language employed was derived. Was it intended merely to prevent those offices from remaining vacant, which became so during the recess of the legislature by some casualty, or was it to prevent any of the enumerated offices from remaining vacant during the recess of the senate, without regard to when or how the vacancy occurred?"

And then, after stating the construction placed upon the constitution of the United States, authorizing the president to fill vacancies, as above quoted, the court held that the constitutional provision intended to provide for vacancies whenever found existing, and that the appointment made by the governor was valid.

The question arose in New Hampshire, and under the practice in that State the governor requested the opinion of the justices of the supreme judicial court upon the subject.

The legislature of New Hampshire had enacted a statute creating the office of auditor of accounts, to be

filled by the legislature, and provided in the act "that if a vacancy shall happen during the recess of the legislature," a successor may be appointed by the governor with the advice and consent of the council, and shall hold his office until a successor be chosen by the legislature and qualified." The legislature, after repeated balloting, were unable to unite upon the same candidate, and adjourned, leaving the office unfilled, as in this case, if the election of defendants is void.

The justices, after stating the case, concluded:

"Every consideration of convenience and of public policy would urge such a construction of the act, if it can properly be given, as to allow of the appointment of the auditor by the governor and council at this time. Now, can there be any doubt as to the intention of the legislature that the act should go into immediate effect?

"At the time of its passage they did not, of course, anticipate that the two branches of the legislature would, after repeated ballotings and the report of a committee of conference, be unable to unite upon the same candidate, and hence, as the act requires an election concurrence, that no election would be made, which is the reason why they spoke of a successor being appointed in case of vacancy, instead of speaking of an incumbent or an auditor. But they evidently intended to make provisions for every case that they supposed could possibly arise.

122 Tenn—36

"And the question is whether the language they had used is fairly capable of such a construction as will cover the vacancy in question. 'For, where the intention of the legislature is plain, as in this case, it is the duty of the court so to construe the act as to carry out those intentions, when the language used will fairly admit of such construction. *Fairbanks* v. *Antrim,* 2 N. H., 105. And when the meaning of the words used is doubtful, or they are susceptible of a double construction, that sense is to be adopted which best harmonizes with the context and the apparent policy and object of the legislature. *Pike* v. *Jenkins,* 12 N. H., 255.

"Here the provision is, 'In the case of any vacancy in said office by death, resignation, or otherwise, a successor shall be appointed,' etc. There is now a vacancy in said office unquestionably, because the office has been created, and the law creating it is in force, and the office is not filled, but is vacant. The term 'vacancy' means an empty space, a place unfilled, and when applied to an office it means the state of being destitute of an incumbent, or a want of the proper officer to officiate in such office. But in neither case has it any reference whatever to any former time, or to any former condition of the place or office. If a place is empty now, there is a vacancy, and it matters not whether it has once been filled, or whether it has always been empty. And so of an office. So far, then, all is plain.

"But the subsequent proviso is that, 'If such vacancy shall happen during the recess of the legislature such

Richardson v. Young.

successor may be appointed,' etc., 'and shall hold his office,' etc. Now, the word 'happen' may have many significations or meanings, depending much upon its connection with other words and the circumstances under which it is used. Where the expression is 'if such vacancy shall happen,' etc., the word 'such' referring to the vacancy just mentioned, which might exist in consequence of death, resignation, or otherwise; that is, in any way or from any cause whatever. 'If any such vacancy shall happen;' that is, shall occur, shall chance to exist, shall happen to be, during the recess of the legislature, etc. The substance of both these sentences might be expressed in this way without doing any violence to the language: 'If there shall happen to be, during the recess of the legislature, any vacancy in said office, which may exist in consequence of death, resignation, or in any way, or for any other cause,' such successor may be appointed by the governor, etc. Believing that such a construction may be fairly given to the language of the act, and that by giving it that construction we should be only giving effect to the clear intent and will of the legislature, our opinion is that the governor and council have a legal right to appoint an auditor under the act in question."

*In Re Farrow* (C. C.), 3 Fed., 112, following the opinions of the attorney-general, it was held that the provision of the constitution we have referred to meant "vacancies that may happen to exist during the recess of the senate," and an appointment by the president

of a district attorney to fill an office which became va·cant while the senate was in session was held valid.

Other cases, which are to some extent in accord with these, are: *Miller* v. *Washington,* 2 Hayw. & H., 244, Fed. Cas., No. 9593a; *Walsh* v. *Com.,* 89 Pa., 419, 33 Am. Rep., 771; *State* v. *Ware,* 13 Or., 380, 10 Pac., 885; *In re Representation Vacancy,* 15 R. I., 621, 9 Atl., 222; *Elliott* v. *Burke,* 113 Ky., 479, 68 S. W., 445.

The legislature evidently intended by the language used in section 3 to provide for vacancies that might, under any circumstances, exist in these important of·fices. And as this intention is fairly expressed, and when taken in connection with the well-settled con·struction of the constitution of the United States in regard to the appointing power of the president, with which the lawmakers are presumed to have been fa·miliar, definitely expressed, it should be given effect. If the question were one of doubt, public policy and the effective administration of the law would require the doubt to be resolved in favor of the power to ap·point.

Suppose the amendatory act was an original statute, and that for some reason the legislature had failed to make an election; would it be contended there was no authority under this statute to fill an office, two va·cancies in which would prevent all elections in the State from being held? And would the act be so con·strued? We think not. The disastrous consequences which would follow a long-continued vacancy in these offices is obvious, and need not be elaborated.

The failure of the legislature to fill the offices was a contingency that its members knew might arise, and it is to be presumed that they did not intend that they should remain vacant at any time for want of an appointing power.

We are of the opinion that the act does provide for filling all vacancies that may be found to exist in the members of the State board of elections at any time; and that, when there exist two or more during recess of the legislature, the comptroller, secretary of State, and treasurer are authorized to fill them, without regard to when the vacancies occurred, and that the appointment of the defendants, conceding the election to have been void, which we do not decide, was valid, and vested them with the title and all the powers of the offices in question.

There is another question, which properly should have been the first disposed of; but we have followed the order of the assignments of error. This objection is in regard to the passage of the act, and is based upon an entry in the house journal. This amendatory act was Senate Bill No. 270. After having been passed on the third reading in the senate, it was sent to the house and there passed first reading. It was then substituted for House Bill No. 340, a similar bill, and passed third reading. It appears from the journal that a motion was made to postpone action on House Bills 340, 341, and 349, and that this motion was tabled. The entry then relied upon recites that another

member "moved that House Bills 340 and 341 be passed upon second reading and referred to committee on elections," and another entry shows that this motion prevailed by a constitutional majority.

It is argued that the entry quoted shows that the amendatory act was not lawfully passed upon a second reading in the house, and in compliance with article 2, section 18, of the constitution, requiring every bill to be read and passed upon three different days in each house before it shall become a law.

The precise contention seems to be, not that the house bill did not pass a second reading by a constitutional majority, but that the entry quoted shows that it was passed concurrently with another bill, No. 341, upon a different subject.

The constitutional provision relied on (section 18, art. 2) does not require each bill to be passed separately, and, while we think that concurrent action upon the two bills would be contrary to good parliamentary procedure, and should not be done upon objection made, we cannot see that this alone would authorize the courts to hold the reading nugatory. But we do not consider the journal entry relied upon as conclusive evidence that the two bills were voted upon at the same time. As is stated in *Nelson* v. *Haywood County,* 91 Tenn., 605, 20 S. W., 3:

"In the nature of things, legislative journals are frequently 'constructed from loose memoranda, made in the pressure of business, and amid the distractions of a numerous assembly.'"

And they cannot always be relied upon to defeat a statute which otherwise appears to have been constitutionally enacted.

It is well settled by repeated decisions of this court that, where an act has been signed by the speakers of each house and approved by the governor, or otherwise passed, as in the case of this act, and published in the printed acts of that session of the general assembly, every presumption is made in favor of the regularity of its enactment and validity. In *Nelson* v. *Haywood County,* supra, it is further said:

.  "The construction placed on the constitutional provisions in relation to the steps to be taken by the legislature in enacting bills, under the decisions of. this court, is to the effect that, while the journals will be considered in determining the validity of an act of the legislature, every reasonable inference and presumption will be drawn and indulged in favor of the regularity of its passage, and where it did not affirmatively appear not to have passed, and such legitimate construction could be given to the record as sustained by law, it would be done."

In *State* v. *Swiggart,* 118 Tenn., 562, 102 S. W., 77, it is said:

"The general assembly is a co-ordinate branch of the government, and every reasonable presumption is made in favor of the regularity and validity of its proceedings."

In *State* v. *McConnell,* 71 Tenn., 341, it is said:

"The bill conceded that the act under consideration was signed by the speakers of both houses of the legislature and by the governor. . . . Under these circumstances, the presumption in favor of the regularity of the passage of the act through all its stages is so strong that the mere failure of the journals of the senate to show a second reading, if the fact be that way, would not affect its validity, but would be treated as a clerical omission."

In *Williams* v. *State,* 74 Tenn., 553, where it appeared that the journal of the house failed to affirmatively show that the bill received a constitutional majority on its third reading, it is said:

"The rule is that the journals may be looked to in order to determine whether the bill was in fact passed, but every reasonable presumption must be made in favor of the action of a legislative body acting in the apparent performance of its legal functions. The courts will not presume, from the mere silence of the journals, that the house had disregarded the constitutional requirements, unless where the constitution expressly requires the fact to appear on the journals."

In the case of *State* v. *Algood,* 87 Tenn., 167, 10 S. W., 312, where the journal of the senate showed that the bill had failed of passage, and a motion to reconsider was made, but no disposition made of the motion appeared, in sustaining the act, Judge Lurton, speaking for the court, said:

"We see from the journal that subsequently the speaker of the senate, in open session, announced that

he had signed this bill; and this solemn official act is noted upon the journal, as required by the constitution. What presumption arises from this evidence of the passage of the bill? We think the rule well settled that, where the journal does not affirmatively show the defeat of the bill, every reasonable presumption and influence will be indulged in favor of the regularity of the passage of an act subsequently signed in open session by the speaker."

We think that under these authorities it must be held that the journal entry, reciting that the two bills were acted upon at one time, was an inaccurate statement of the clerk, or a clerical error, or that at a subsequent time the bill was lawfully passed upon its second reading. It is not a case where it affirmatively appears from the journal that the constitutional requirement was not complied with. As stated, the bill appears to have been signed by the speakers of both houses, vetoed by the governor upon other objections than the one here made, and afterwards passed over his veto, and we do not think the journal entry relied upon is sufficient to overcome this evidence of its lawful enactment.

The result is that there is no error in the decree of the chancellor dismissing complainants' bill, and it is in all things affirmed.